Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 4008
Madison, MS  39130
(601) 852-3440
stephen@sdslaw.us
MS Bar No. 102784
*Admitted Pro Hac Vice

Attorneys for Plaintiffs
ANDREW TETER & JAMES GRELL

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII**

| | |
|---|---|
| ANDREW TETER and JAMES GRELL | ) Civil No. 1:19-cv-00183 ACK-WRP |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) MEMORANDUM IN OPPOSITION TO |
| v. | ) DEFENDANTS' MOTION FOR |
| | ) SUMMARY JUDGMENT |
| CLARE E. CONNORS, in her | ) |
| Official Capacity as the Attorney | ) |
| General of the State of Hawaii and AL) | |
| CUMMINGS in his Official Capacity | ) HEARING: April 28, 2020 11AM |
| as the State Sheriff Division | ) TRIAL: June 16, 2020 9AM |
| Administrator | ) JUDGE: Hon. Alan C. Kay |
| | ) |
| Defendants. | ) |
| _____ | ) |

## **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

I.    Introduction…………………………………………………………….1

II.   Argument

    a.  Knives Are the Most Common Arm……………………………………..1

    b.  Defendants' Evidence Is Inapplicable………………………...………….2

    c.  The Laws of the Kingdom of Hawaii Are Inapplicable…………………4

    d.  Butterfly Knives Are Not Dangerous and Unusual ………...……………7

    e.  Butterfly Knives Are Not Like Switchblades …………………..………8

    f.   *Lacy* is Inapplicable to Plaintiffs' Challenge ……………….…………12

    g.  *Fyock* Allows for the Application of Strict Scrutiny……..……………14

    h.  This Court Should Rely on *State v. Delgado*…………………….....…16

    i.   This Court Should Rely on *State v. Herrmann* and not *State v. Murillo*…………………………………………………….…………..18

    j.   HRS 134-53 Cannot Survive Intermediate Scrutiny……………………19

III.  Conclusion……..……………………………………………....…...…..24

TABLE OF AUTHORITIES

**Cases**

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989).......................... 20, 21

*City of Cincinnati v. Discovery Network*, *Inc.*, 507 U.S. 410  (1993) ....................22

*District of Columbia v. Heller*, 554 U.S. 570, 598 (2008) .............................. passim

*Duncan v. Becerra*, 366 F. Supp. 3d 1131, 2019 U.S. Dist. LEXIS 54597 15, 20, 23

*English v. State*, *35 Tex. 473, 14 Am. Rep. 374 (1872)* .............................................3

*Fla. Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) .................................................21

*Fyock v. City of Sunnyvale*, 779 F.3d 991, 2015 U.S. App. LEXIS 3471 ... 7, 14, 15, 16

*Jackson v. City & County of San Francisco,* 746 F.3d 953, 2014 U.S. App. LEXIS 5498...................................................................................................23

*Lacy v. State*, 903 N.E.2d 486, 2009 Ind. App. LEXIS 526 ...................... 12, 13, 14

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) ...........................................21

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) .......................................................19

*Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192 (9th Cir. 2013) ...........20

*New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 2015 U.S. App. LEXIS 18121 ............................................................................... 10, 19

*Parents for Privacy v. Barr*, 2020 U.S. App. LEXIS 4503 ....................................22

*People v. Castillolopez*, 63 Cal. 4th 322, 371 P.3d 216, 202 Cal. Rptr. 3d 703, 2016 Cal. LEXIS 3754...................................................................................13

*People v. Walker*, 2019 Ill. LEXIS 329, 2019 WL 1307950....................................2

*Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972) ........................................22

*Shew v. Malloy*, 136 S. Ct. 2486, 195 L. Ed. 2d 822 (2016) ..................................20

*State v Murillo*, 347 P.3d 284 (2015).......................................................... 1, 18, 19

*State v. DeCiccio*, 315 Conn. 79, 105 A.3d 165, 2014 Conn. LEXIS 447..............16

*State v. Delgado*, 692 P.2d 610 (Or. 1984) ...................................................... passim

*State v. Herrmann*, 2015 WI App 97, 366 Wis. 2d 312,  873 N.W.2d 257, 2015
    Wisc. App. LEXIS 832 ............................................................... 18, 19

*State v. Mendoza*, 920 P.2d 357 (Ha. 1996) ............................................... 6

*State v. Muliufi* 643 P.2d 546 (1982) ......................................................... 18

*United States v. Henry*, 688 F.3d 637, 2012 U.S. App. LEXIS 16615, 2012 WL
    3217255 ................................................................................................ 7

*Worman v. Healey*, 922 F.3d 26, 2019 U.S. App. LEXIS 12588 ........................... 20

**Statutes**

HRS § 134-53 ................................................................................. 23

Militia Act of 1792 ........................................................................ 2

**Other Authorities**

David B. Kopel, Clayton E. Cramer & Joseph Edward Olsen, Knives and the
    Second Amendment, 47 U. Mich. J.L. Reform 167, 183 (Fall 2013) ......... 2, 8, 13

*Fyock et al., v. The City Of Sunnyvale et al. 4:13cv5807,*   Sunnyvale's Opposition
    to Plaintiff's Motion for Preliminary Injunction Docket Number [36] ............... 16

George C. Wilson, Visible Violence, 12 NAT'L J. 886, 887 (2003) ...................... 7

Harwell Wilson & Roger Sherman, Civilian Penetrating Wounds to the Abdomen,
    153 ANNALS OF SURGERY 639, 640 (1961) .................................................. 21

HRS Const. Art. I, § 17 ................................................................................. 6

Joseph Tussman & Jacobus tenBroek, The Equal Protection of the Laws, 37
    CALIF ................................................................................................ 21

Kenneth L. Karst, Equality as a Central Principle in the First Amendment, 43 U.
    CHI. L. REV. 20 (1975) ......................................................................... 22

Kingdom of Hawaii Constitution of 1840, "Governors." ......................................... 5

## I.  Introduction

Defendants' Motion for Summary Judgment should be denied.  Based on the both Plaintiffs' and Defendants' evidence, butterfly knives are typically owned for the lawful purposes of martial arts training and self-defense.  While Plaintiffs do not concede that switchblades have any special propensity for criminality, Defendants' attempt to analogize to them is inapplicable.   As Defendants' own exhibits demonstrate, butterfly knives are arms typically used for the lawful purposes of self-defense and martial arts training.   As such they receive Second Amendment protection. As a preliminary matter, Defendants make no argument that their ban survives strict scrutiny and thus concede that if this Court applies strict scrutiny the ban is unconstitutional.  And even if this Court uses intermediate scrutiny as shown below, Hawaii's complete ban is unconstitutional.

## II.  Argument

### a.  Knives Are the Most Common Arm

Relying on *State v Murillo,* 347 P.3d 284 (2015), Defendants argue that "butterfly knives are not a 'quintessential self-defense weapon' for defense in the home, like handguns". Defendants' MSJ at 12. This is extrapolated from *Murillo's* holding (which Defendants quote) that knives are a "peripheral set of arms".  This is patently false.  "[K]nives have played an important role in American life, both as tools and as weapons. The folding pocketknife, in particular, since the early 18th

century has been commonly carried by men in America and used primarily for work, but also for fighting." *State v. Delgado*, 692 P.2d 610 (Or. 1984). The federal Militia Act of 1792 required all able-bodied free white men between 18 and 45 to possess, among other items, "a sufficient bayonet….".[1] This establishes that knives were in common use and arms used for militia purposes during the founding of our nation. In fact, knives are the "most common 'arm' in the United States". *See* David B. Kopel, Clayton E. Cramer & Joseph Edward Olsen, Knives and the Second Amendment, 47 U. Mich. J.L. Reform 167, 183 (Fall 2013). "Only about half of U.S. households possess a firearm, and many of those households have only one or two firearms. In contrast, almost every household possesses at least several knives." *Id.*

b. Defendants' Evidence Is Inapplicable

As a preliminary matter, Plaintiffs disagree with Defendants' argument that certain types of knives can be outside of constitutional protection assuming knives are as a whole are protected.[2] *Heller* found that handguns, as a class, are constitutionally protected arms. After that, the Supreme Court did not delve into whether the particular handgun Dick Heller possessed was constitutionally

---

[1] Militia Act, 1 STAT. 271-04 (1792).

[2] Plaintiffs did not include a citation to *People v. Walker*, 2019 Ill. LEXIS 329, 2019 WL 1307950 in their moving papers. The court in *Walker* struck Illinois's ban on taser ownership and carry by applying a categorical approach and supports the use of a categorical approach it this case.

protected.[3]  Similarly, *Heller* used knives as an example of an arm. *See Heller*, 554 U.S. at 590 (emphasis added) ("In such circumstances the temptation [facing Quaker frontiersmen] to seize a hunting rifle or ***knife*** in self-defense... must sometimes have been almost overwhelming."). Butterfly knives as well as all other types of knives must receive constitutional protection.  This is supported by the fact that Defendants cannot identity a single case that agrees with their position, and as listed in Plaintiffs moving papers, a bevy of Courts have found otherwise.[4]

Defendants claim that the Philippines outlawed the butterfly knife for similar reasons "it was outlawed in Hawaii in 1999."  Defendants' MSJ at 4.  And then the Defendants quote a Wikipedia article for the proposition that it is "generally illegal to carry [a butterfly knife] without identification or a proper permit in the streets of [Manila]…"  *Id*.  Thus, per Defendants' authority, butterfly knives are legal to possess in the Philippines and the only restrictions are on carry outside the home. Even if Filipino law had any relevance to U.S. constitutional law, this is a strange

---

[3] The handgun Dick Heller wished to register was a High Standard 9-shot revolver in .22 with a 9.5" Buntline-style barrel. *See* https://www.hoffmang.com/firearms/dc-roster/msj-2009-04-13/SJ_SEPERATE_STATEMENT.pdf  at *7 (last visited 1/17/2020) and  App. to Pet. for Cert. U.S. Supreme Ct. 07-290 at 119a. This is not a common handgun.

[4] Defendants cite to *English v. State,* 35 Tex. 473, 14 Am. Rep. 374 (1872). However, this case embraced a militia centric view that was directly rejected in *Heller* in lieu of a right to personal self-defense.

argument because in Hawaii, the butterfly knife is completely banned, and no identification document or permit would allow carry in the streets or even mere possession in the home.

Defendants fail to demonstrate with any competent summary judgment evidence that there are any genuine issues of material fact which would render summary judgment inappropriate for the Plaintiffs and further, Defendants' arguments are unsupported by current caselaw. As such, summary judgment should be granted for the Plaintiffs and Defendants' motion denied.

c.  The Laws of the Kingdom of Hawaii Are Inapplicable

Defendants' reliance on laws from the Kingdom of Hawaii completely lack merit. As a preliminary matter, the cited to law only deals with carrying weapons outside the home so it has no applicability to Plaintiffs' challenge to possession in the home.[5]  Moreover, these laws are the relic of a monarchical regime that has no relevance in analyzing our system of constitutional law.

Even after transitioning to a constitutional monarchy, the Kingdom of Hawaii Constitution of 1842 did not recognize a right of the people to bear arms.[6]  Quite to

---

[5] The same applies to the cited to laws on carrying butterfly knives from the Philippines. And the laws of a foreign nation are even less applicable to the Plaintiffs' challenge.

[6] *See* http://www.hawaii-nation.org/constitution-1840.html. (last visited 1/16/2020)

the contrary, it declared unequivocally that the "four Governors over these Hawaiian Islands ... shall have charge of ... the arms and all the implements of war." Kingdom of Hawaii Constitution of 1840, "Governors." Consistent with an exclusive claim to arms, the 1840 Constitution declared that the king "is the sovereign of all the people and all the chiefs." *Id.,* "Prerogatives of the King.". Indeed, traders and settlers selectively doled out firearms in order to "unite[] Hawaii's eight main islands into a single kingdom [under] Kamehameha I....".[7] Thereafter, native Hawaiians continued to be disarmed, as more and more settlers arrived, with generally only the European-installed government (and select Caucasian inhabitants) being permitted to possess arms.[8] The monopoly on arms was later used to solidify American control over the Hawaiian Islands through the "Bayonet Constitution" of 1887.[9]

---

[7] J. Greenspan, "Hawaii's Monarchy Overthrown with U.S. Support, 120 Years Ago," https://www.history.com/news/hawaiis-monarchy-overthrown-with-u-s-support-120-years-ago  (Jan. 17, 2013). (last visited (1/16/2020)

[8] Odd Fighting Units: The Honolulu Rifles during the Hawaii Rebellions, 1887-1895," Warfare History Blog (Aug. 13, 2012) http://warfarehistorian.blogspot.com/2012/08/odd-fighting-units-of-world-history.html (last visited 1/16/2020)

[9] "1887: Bayonet Constitution," National Geographic ("The new constitution was written by a group of white businessmen and lawyers who wanted the kingdom to be part of the United States. This group, called the Hawaiian League, was supported by an armed militia called the Honolulu Rifles.") https://www.nationalgeographic.org/thisday/jul6/bayonet-constitution/ (last visited 1/16/2020)

This is hardly a noble pedigree to apply when determining the right of a sovereign people to keep and bear arms. *See District of Columbia v. Heller*, 554 U.S. 570, 598 (2008). Rather, Hawaii's monarchial history undermines its claims, making it an extreme outlier among the states — embracing a view of its rulers and people that was utterly rejected by our Declaration of Independence and the Constitution of 1787. It was not until 1898 that the United States annexed Hawaii as a territory. It was not until 1950 that the current state constitution was adopted (including language mirroring the Second Amendment).[10] And it was not until 1959 that Hawaii was granted statehood. In short, Hawaii's history on weapons regulation is utterly irrelevant here. Rather than being embraced as "longstanding"[11] and/or "presumptively lawful," Hawaii's antiquated weapons regulatory scheme should be rejected out of hand — a relic of history, not unlike the sovereign prerogatives of King George, against which this country's Second Amendment was designed to protect. This Court should decline the government of Hawaii's invitation to embrace its history of disarmament.

---

[10] *See* HRS Const. Art. I, § 17; *see also State v. Mendoza*, 920 P.2d 357, 362 (Ha. 1996).

[11] In a passing reference, Defendants seem to argue that because Hawaii regulated "bladed weapons" in 1852, a law that was enacted in 1999 is somehow granted longstanding status. *See* Defendants' MSJ at 10-11. This argument is logically incorrect as a law cannot possibly be considered "longstanding" when the ban struck in *Heller* was enacted in the 1970s.

d. Butterfly Knives Are Not Dangerous and Unusual

Based upon this Circuit's precedent, this Court should not find that butterfly knives are dangerous and unusual weapons. In the Ninth Circuit, whether an arm is dangerous is determined through its capacity to inflict harm on others. *See United States v. Henry*, 688 F.3d 637, 640, 2012 U.S. App. LEXIS 16615, *6-7, 2012 WL 3217255 ("a modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds. *See* George C. Wilson, Visible Violence, 12 NAT'L J. 886, 887 (2003). Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns"). We know based on *Heller* that a handgun is not lethal enough to be dangerous within the context of the Second Amendment. And Defendants have already admitted that knives are less deadly than handguns. *See* Deposition of Robin Nagamine, Docket No. 34-6, Tr. at 27:19-21. Defendants' witness agreeing that a "knife is less dangerous than a handgun". Even firearm magazines that hold over 10 rounds that allow for sustained fire are not too dangerous as to be outside of constitutional protection. *See Fyock v. City of Sunnyvale*, 779 F.3d 991, 2015 U.S. App. LEXIS 3471. And as established below by Defendants' own exhibits, butterfly knives are commonly possessed for lawful purposes and are thus not unusual arms. For these reasons, the State's dangerous and unusual argument must be rejected.

e. <u>Butterfly Knives Are Not Like Switchblades</u>

Assuming without conceding the State's propositions about switchblades are correct, these propositions cannot be analogized to butterfly knives.[12]   First, Defendants argue that both are "concealable" because their blade can fit into its handle than and that they can be "deployed quickly". Defendants' MSJ at 9. These arguments are spurious.  A butterfly knife is no more concealable than a standard pocketknife. And any folding knife, such as a Swiss Army Knife's blade, also fits into its handle.  Perhaps trying to rebut Plaintiffs' Expert, Defendants state that a

---

[12]  In fact, switchblades are arms designed and used for lawful purposes. The belief that they are used for criminal purposes is a product of Hollywood, much like the nunchaku bans after Bruce Lee used them in movies. "Automatic knives were first produced in the 1700s. The earliest automatic knives were custom made for wealthy customers. By the mid-19th century, factory production of automatic knives made them affordable to ordinary consumers. During World War II, American paratroopers were issued switchblade knives, "in case they become injured during a jump and needed to extricate themselves from their parachutes." The switchblade enabled them to cut themselves loose with only one hand. In the 1950s, there was great public concern about juvenile delinquency. This concern was exacerbated by popular motion pictures of the day--such as Rebel Without a Cause (1955), Crime in the Streets (1956), 12 Angry Men (1957), and The Delinquents (1957)--as well as the very popular Broadway musical West Side Story. These stories included violent scenes featuring the use of automatic knives by the fictional delinquents. Partly because of Hollywood's sensationalism, the switchblade was associated in the public mind with the juvenile delinquent, who would "flick" the knife open at the commencement of a rumble with a rival gang, or some other criminal activity. This is an important part the origin of the many statutes imposing special restrictions on switchblades." *See* David B. Kopel, Clayton E. Cramer & Joseph Edward Olsen, Knives and the Second Amendment, 47 U. Mich. J.L. Reform 167 (Fall 2013) *16.

"butterfly knife can be opened and ready for use very quickly" and cite to six YouTube videos.[13]  Defendants' MSJ at 5.

Notwithstanding not being provided this information beforehand, these videos do nothing to rebut Plaintiffs' Expert Witness who, from a concealed position with his hands off the butterfly knife, performed a test to demonstrate the butterfly knife's opening speed from concealment.  All videos in Defendants' MSJ appear to have the user start with the hand already on the butterfly knife and only one video purports to show the user draw from concealment.[14] But even this video does not offer a persuasive rebuttal to Plaintiffs' Expert because the user again has his hand on the butterfly knife in his pocket before he draws and opens the butterfly knife.  And in any event, Plaintiffs' Expert video demonstrated that a standard folding pocketknife opens <u>faster</u> than a butterfly knife.

Accepting Defendants' position would lead to the absurd result of all folding knives (and most small fixed knives) being constitutionally unprotected.  That cannot be when *Heller* found handguns to be protected.  Handguns are both concealable in the pocket and are much more dangerous than any type of knife. Furthermore, even assuming some gang members were found with butterfly knives

---

[13] These videos made their first appearance in Defendants' Motion for Summary Judgment and had not been produced in discovery beforehand, nor have Defendants designated any expert to rebut Plaintiffs' expert testimony and video.

[14] That video is titled "Balisong Fast Opening for Fighting".

at the time of their prohibition in 1999, that does not follow that butterfly knives' typical use is for unlawful purposes.  As the Second Circuit has stated, *Heller* holds there is a presumption that arms are constitutionally protected, and the burden is on the government to rebut that presumption. "*Heller* emphasizes that 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms.' *Heller*, 554 U.S. at 582. In other words, it identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *See New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257, 2015 U.S. App. LEXIS 18121, *29.

Citation to an unsubstantiated legislative comment is insufficient to rebut this presumption especially in like of the fact Plaintiffs have submitted expert evidence that butterfly knives are typically used for lawful purposes and open slower than both a common folding knife and a switchblade.  Butterfly knives are legal to own in forty-seven (47) states and case law supports they are constitutionally protected.

Defendants' very own submissions rebut their arguments that butterfly knives are used for unlawful purposes:

> The Balisong knife is without a doubt one of the most popular knives today... The modern balisong knife has plenty of uses unlike the ancient ones. Today, it is one of the knives with massive fanbase. It has been transformed into a multipurpose knife. Because its blade can be concealed inside the two handles, it has become the easiest to carry knife. So, people prefer carrying it in the pocket as their primary self defense weapon. It works brilliantly as the defense weapon. Since it is quick, the blade can be deployed at once. Hence, the user has every

chance to survive against the attacker. The safety of carrying this knife is another factor that has made this knife popular. The blade is concealed and locked inside the two handles. There is no chance that blade accidentally opens in your pocket. Therefore, you can comfortably carry the knife. The modern butterfly knife is lightweight and small, but is sturdy enough.

*See* Defendants Motion for Summary Judgment Exhibit F.  And then from the

legislative history:

However, butterfly knives or "Balisong" are an integral part of the filipino martial art called Escrima. Like Karate, Aikido, or TKacw on Do, Escrima is a martial art that developed and arose out of the country's unique culture. In the case of the Philippines, the blade arts became an essential part of Escrima specifically because the average filipino man needed to carry a knife for hunting, harvesting and general self-defense. Similarly, Indonesia also has a strong tradition of "blade arts." Escrima and Balisong practice were endemic through-out the Philippine Islands even before colonization first by the Spanish, and later by the U.S. Escrima schools here in Hawaii teach Balisong as a legitimate martial art.

*See* SOH 00021 Testimony of Ronette M. Kawakami Deputy Public Defender, on

behalf of the Office of the Public Defender, State of Hawai'I to the Senate Committee

on Judiciary.  Further legislative history states:

Over the past 30 years our school has trained hundreds of people from all walks of life in the weapons-based Filipino Martial Arts that include the Balisong. The Balisong-butterfly knife developed in the Philippines in the 1940's has earned a reputation as a weapon of mystique, but in it's simplest form it is nothing more than any other knife in that it has a point and a cuing edge. I ask that you reconsider, and withdraw the Balisong-butterfly knife as a prohibited weapon and allow those of us honest citizens to continue to use this weapon as a cultural tool as it should be. I have a copy of SB 606 and see that HB1496 is patterned after SB 606.

In SB606 the outcome was that the Balisong owner was in violation of the law by having in his or her possession a butterfly knife. I ask that you consider not taking the easy way out by merely following HB1496. Instead I hope that you will take the time to research and find a way for those of us to use the Butterfly knife as a cultural instrument can continue to do so. We advocate that stiff penalties should be in effect for those individuals that use these or any other weapon in violent crime, but let us not destroy cultural traditions enjoyed by many because of the actions of a few. Make the criminals pay, not the citizens. Mahalo for your time.

*See* SOH 00026 Testimony of Ron England Sr. Chief instr. Pedoy School of Escrima.

And analogous to the California Supreme Court's holding that finding a pocket knife could be a dirk "would in effect make nearly every folding knife a locking knife, thereby rendering the category of nonlocking folding knives essentially a null set" and defeat legislative intent, adopting Defendants' position would make *Heller*'s finding that arms in common use  are constitutionally protected similarly hollow. *People v. Castillolopez*, 63 Cal. 4th 322, 332, 371 P.3d 216, 221, 202 Cal. Rptr. 3d 703, 710, 2016 Cal. LEXIS 3754, *17.

   f.  <u>*Lacy* is Inapplicable to Plaintiffs' Challenge</u>

*Lacy v. State*, 903 N.E.2d 486, 2009 Ind. App. LEXIS 526 has no bearing on Plaintiffs' challenge. Lacy was an as-applied challenge to a criminal possession of a *switchblade* outside the home under the Indiana Constitution. "…we pass over Lacy's contention that Ind. Code § 35-47-5-2 is unconstitutional on its face and turn

instead to whether its application in this case was unconstitutional". *Id. At* 489.

Further, it relied on a faulty premise:

> Lacy quotes *Crowley Cutlery Co. v. U.S.* (7th Cir. 1988) to refute the Oregon Supreme Court's position in *Delgado* that switchblade knives are not intrinsically different from other knives. Crowley argued that switchblade knives "are more dangerous than regular knives because they are more readily concealable and hence more suitable for criminal use." It requires no expert testimony to demonstrate that this claim is incorrect. A switchblade knife's handle, when closed, must be at least as long as the blade. In this respect, it is no different from any folding knife, where the enclosure must be slightly longer than the blade. No switchblade knife can be any more concealable than its non-automatic counterpart.

D. Kopel, Clayton E. Cramer & Joseph Edward Olsen, Knives and the Second Amendment, 47 U. Mich. J.L. Reform 167, 183 (Fall 2013).

Furthermore, butterfly knives are an entirely different type of knife with a different history. And unlike Plaintiffs who challenge Hawaii's in the home possession ban on butterfly knives, Lacy was caught outside the home with a switchblade:

> The relevant facts follow. On September 11, 2004, Indiana Conservation Officer James Schreck noticed three people driving all terrain vehicles without registration decals Officer Schreck attempted to stop the people, but they fled on the vehicles. Officer Schreck patrolled the area and found an all terrain vehicle off the road in the woods. Officer Schreck eventually located Lacy lying down in the grass. Officer Schreck arrested Lacy and patted her down. Officer Schreck discovered a pocketknife and a four-inch long switchblade on Lacy.

*Id.* at 488.

13

Thus, an in the home as-applied challenge to Indiana's ban on switchblade might very well be successful under the Indiana Constitution. Moreover, the Indiana Constitution has a completely different standard of review than the Second Amendment challenge brought by Plaintiffs. Under the Indiana Constitution, "Courts defer to legislative decisions out when to exercise the police power and typically require only that they be rational". *Id* at 490. As briefed in Plaintiffs' moving papers, *Heller* requires a higher level of scrutiny when evaluating Second Amendment challenges. For all these reasons, *Lacy* has no relevance to the instant matter.

g. *Fyock* Allows for the Application of Strict Scrutiny

Amicus Everytown for Gun Safety argues that Circuit precedent requires intermediate scrutiny in this matter. Everytown for Gun Safety Amicus Brief at 8. They rely on *Fyock v. City of Sunnyvale* which applied intermediate scrutiny in evaluating a ban on magazines which hold over ten rounds:

> Indeed, Measure C does not affect the ability of law-abiding citizens to possess the "quintessential self-defense weapon"—the handgun. *See Heller,* 554 U.S. at 629. Rather, Measure C restricts possession of only a subset of magazines that are over a certain capacity. It does not restrict the possession of magazines in general such that it would render any lawfully possessed firearms inoperable, nor does it restrict the number of magazines that an individual may possess. To the extent that a lawfully possessed firearm could not function with a lower capacity magazine, Measure C contains an exception that would allow possession of a large-capacity magazine for use with that firearm. Sunnyvale, Cal. Muni. Code § 9.44.050(c)(8). For these reasons, there was no abuse of discretion in finding that the impact Measure C may

have on the core Second Amendment right is not severe and that intermediate scrutiny is warranted.

*Fyock v. City of Sunnyvale*, 779 F.3d 991, 999, 2015 U.S. App. LEXIS 3471, *19.

The Ninth Circuit, on abuse of discretion review, accepted the trial court's application of intermediate scrutiny because magazines are merely a tool to use in handguns and are not an arm itself.  This holding is not binding on trial courts. "Fyock's conclusion about the severity of Sunnyvale's large-capacity magazine ban was fact-bound. It did not announce as a matter of law that magazine capacity bans of any kind never impose a severe burden on Second Amendment rights."  *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1158, 2019 U.S. Dist. LEXIS 54597, *54-55. It certainly is not binding on this Court when reviewing a ban on an actual protected arm.

*Heller* defined "arms" as "'weapons of offence, or armour of defence.'" 554 U.S. at 581 (*quoting* Samuel Johnson, 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)). "Thus, the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id*. at 582. Large-capacity magazines are a piece of equipment used to make weapons more effective; they are not themselves weapons and they are not an integral part of any weapon, since smaller magazines

can also be used in their stead. All otherwise legal varieties of handguns and long guns remain available.[15]

Thus, the Ninth Circuit accepted the *Fyock* trial court's application of intermediate scrutiny because a ban on magazines over ten rounds does not affect the ability of law-abiding citizens to possess protected arms.  Unlike the magazine ban at issue in *Fyock,* the challenged law in this matter bans possession of a protected type of arm (butterfly knives). And knives, as shown above, are as quintessential to self-defense as handguns. Thus, Circuit precedent supports applying a higher level of scrutiny than the one used in *Fyock*.  However, as shown below, even if this Court does apply intermediate scrutiny, Hawaii's butterfly knife ban is unconstitutional.

h.  <u>This Court Should Rely on *State v. Delgado*</u>

The Oregon Supreme Court's right to arms analysis under its state constitution "mirrors the model employed by the United States Supreme Court in *District of Columbia v. Heller*, supra, 554 U.S. 624-25". *See State v. DeCiccio*, 315 Conn. 79, 117, 105 A.3d 165, 191, 2014 Conn. LEXIS 447, *63. And thus, it is authority this Court should rely on.  In *State v. Delgado*, the Oregon Supreme Court found Oregon's ban on switchblades to be unconstitutional under its state constitution.

---

[15] In fact, the record in *Fyock* demonstrated that the average defensive shooting only involves 2.1. rounds. See 4:13cv5807, *Fyock et al., v. The City Of Sunnyvale et al.* Sunnyvale's Opposition to Plaintiff's Motion for Preliminary Injunction Docket Number [36] at *14 fn. 10.

The Court first engaged in a historical analysis similar to that employed in

*Heller* finding that:

> In early colonial America the sword and dagger were the most commonly used edged weapons. During the American colonial era every colonist had a knife. As long as a man was required to defend his life, to obtain or produce his own food or to fashion articles from raw materials, a knife was a constant necessity. Around 1650 one form of dagger popular in the colonies was the "plug bayonet," so called because it fit into the muzzle of a musket. It was used both as a dagger or as a general utility knife. Other knives became popular during the 17th and 18th centuries. The American frontiersman used a large knife to ward off danger from Indian attacks and to hunt and trap; along with that he carried a smaller knife, the blade being three to four inches long, in his rifle bag.

*State v. Delgado*, 298 Ore. 395, 401-403, 692 P.2d 610, 613-614, 1984 Ore. LEXIS

1934, *10-13, 47 A.L.R.4th 643.  It then found that a switchblade is constitutionally

protected based on these historical antecedents:

> We are unconvinced by the state's argument that the switch-blade is so "substantially different from its historical antecedent" (the jackknife) that it could not have been within the contemplation of the constitutional drafters. They must have been aware that technological changes were occurring in weaponry as in tools generally. The format and efficiency of weaponry was proceeding apace. This was the period of development of the Gatling gun, breach loading rifles, metallic cartridges and repeating rifles. The addition of a spring to open the blade of a jackknife is hardly a more astonishing innovation than those just mentioned.

*State v. Delgado*, 298 Ore. 395, 403, 692 P.2d 610, 614, 1984 Ore. LEXIS 1934,

*13-14, 47 A.L.R.4th 643.

A butterfly knife, while Filipino in origin and thus different than colonial

analogues, still falls within this tradition and should be found protected "especially

here in Hawaii where the oriental culture and heritage play a very important role in society." *See State v. Muliufi* 643 P.2d 546, 548 (1982).

    i.  <u>This Court Should Rely on *State v. Herrmann* and not *State v. Murillo*</u>

For the same reasons that the Wisconsin Court distinguished *Murrilo,* so should this Court.

> *Murillo* is factually distinguishable because, unlike Herrmann, the defendant in *Murillo* did not possess a switchblade in his own home for his protection. Instead, he was convicted of possessing a switchblade after using it in a fight at a Wal-Mart. *Id.* at 286. Accordingly, *Murillo* did not implicate the core Second Amendment right to keep and bear arms in one's own home for self-defense.

*State v. Herrmann*, 2015 WI App 97, P17, 366 Wis. 2d 312, 324, 873 N.W.2d 257, 263, 2015 Wisc. App. LEXIS 832, *13.

Here, Plaintiffs challenge Hawaii's ban on butterfly knives inside the home. Further, Plaintiffs have made efforts to conduct discovery and submit expert testimony[16] and other evidence unlike the litigant in *Murillo*.

> We also observe that the defendant in *Murillo* did not raise his Second Amendment challenge in the trial court and therefore deprived the State of the opportunity to make an evidentiary showing that the challenged statute withstood intermediate scrutiny. *Id*. at 286, 289 n.2. The *Murillo* court nevertheless chose to address the defendant's argument, reasoning, "Other cases have addressed the issue, and, rather than remanding this case to the district court, we can address Defendant's arguments based on case law." *Id*. at 289 n.2. Thus, although the *Murillo* court purported to apply intermediate scrutiny, it did not actually hold the government to its burden of proof, choosing instead

---

[16] The Defendants have not submitted any expert report or testimony in this matter and their time to designate experts has lapsed.

to rely on unsupported statements from pre-*Heller* case law about the dangerousness of switchblades and their frequent use by criminals. *See* id. at 288-89. Unlike the *Murillo* court, we do not find these unsupported statements persuasive.

*State v. Herrmann*, 2015 WI App 97, P19, 366 Wis. 2d 312, 326, 873 N.W.2d 257, 263, 2015 Wisc. App. LEXIS 832, *14-15.  For the reasons argued in Plaintiffs' moving papers and above, this Court should disregard *Murillo* as inapplicable to Plaintiffs' challenge.

j.   HRS 134-53 Cannot Survive Intermediate Scrutiny

Even assuming intermediate scrutiny applies, the State's ban fails. The State opines that its interest in banning butterfly knives is to promote public safety.  Even under intermediate scrutiny, a challenged restriction cannot burden substantially more constitutionally protected conduct than necessary to achieve the State's interest. *McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014). And under intermediate scrutiny the State is not allowed to rely on "'shoddy data or reasoning.' Defendants must show 'reasonable inferences based on substantial evidence' that the statutes are substantially related to the governmental interest.'" *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015), cert. denied sub nom., *Shew v. Malloy*, 136 S. Ct. 2486, 195 L. Ed. 2d 822 (2016) (citations omitted) (emphasis in original) (striking down New York State's 7 round magazine limit).

Here, the State does not present any evidence that its ban on butterfly knives promotes public safety whatsoever. Even assuming a ban on carrying them outside

the home is justified due to their concealability, it does not follow that it promotes public safety to ban them in the home.  Nor has it shown that its ban is "narrowly tailored to further that substantial government interest." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1170, 2019 U.S. Dist. LEXIS 54597, *82. "As the Supreme Court succinctly noted in a commercial speech case, narrow tailoring requires 'a fit between the legislature's ends and the means chosen to accomplish those ends.'" *Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192, 1204 (9th Cir. 2013) (quoting *Bd. of Tr. of the State Univ. of New York v. Fox*, 492 U.S. 469, 480, 109 S. Ct. 3028, 106 L. Ed. 2d 388 (1989))." *See Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1170, 2019 U.S. Dist. LEXIS 54597, *82.

Rather, the State has misapplied that law by arguing it can demonstrate tailoring by showing that it only bans a certain set of knives.  This contradicts *Heller's* reasoning. "There, the Court unequivocally rebuffed the argument 'that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.'" 554 U.S. at 629. *Worman v. Healey*, 922 F.3d 26, 36, 2019 U.S. App. LEXIS 12588, *18. Here, the State bans butterfly knives in the home when *Heller* requires it to allow handgun possession.  It does so because it claims that butterfly knives are easier to conceal.  Even if that could justify a ban outside the home, what possible rationale could that be to ban constitutionally protected arms inside the home based on their concealability? And accepting the

State's position, it could ban every single pocketknife and still survive constitutional muster.   That is a nonsensical position when *Heller* precludes a prohibition on handguns. Especially when a host of other knives are legal, deadlier and commonly possessed in most people's kitchens. E.g. a butcher knife attack has a 13.3% mortality rate compared to a switchblade (which the State appears to argue is roughly as deadly as a butterfly knife) attack which has 5.9 % mortality rate. *See* Harwell Wilson & Roger Sherman, Civilian Penetrating Wounds to the Abdomen, 153 ANNALS OF SURGERY 639, 640 (1961) at *4.

As other equally concealable knives such as pocketknives and deadlier knives such as butcher knives are legal, the butterfly knife ban is too underinclusive to survive intermediate scrutiny. In constitutional law, underinclusivity follows necessarily from the evaluation of a fit between means and ends. *see Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001); 556; *Fla. Bar v. Went For It, Inc.,* 515 U.S. 618, 632 (1995); *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).

The assessment of fit looks to the relation between the class who comes within the scope of the regulation's stated objective, and the class actually affected by the regulation. *See, e.g.,* Joseph Tussman & Jacobus tenBroek, The Equal Protection of the Laws, 37 CALIF. Under this standard, what matters is not whether a regulation is specifically overinclusive, but rather by how much it is either over or

underinclusive. *See, e.g., City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428 (1993) (holding a city ordinance intended to advance safety and aesthetic interests unconstitutional because it unjustifiably affected only a small fraction of operating newsracks, thus constituting an unreasonable fit between ends and means). *See also Parents for Privacy v. Barr*, 2020 U.S. App. LEXIS 4503, *53 ("Underinclusiveness is determined with respect to the burdens on religious and non-religious conduct and the interests sought to be advanced by the policy").

The Court first developed this test in the equal-protection context, and subsequently imported it into First Amendment doctrine in the early 1970s. *See, e.g., Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972); Kenneth L. Karst, Equality as a Central Principle in the First Amendment, 43 U. CHI. L. REV. 20 (1975). The Ninth Circuit uses First Amendment principles to evaluate Second Amendment claims. "In analyzing the second prong of the second step, the extent to which a challenged prohibition burdens the Second Amendment right, we are likewise guided by First Amendment principles." *Jackson v. City & County of San Francisco*, 746 F.3d 953, 961, 2014 U.S. App. LEXIS 5498, *13, 2014 WL 1193434. Thus, under intermediate scrutiny, Plaintiffs' challenge calls for an assessment of "the fit between the challenged regulation and the asserted objective," *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 98 (1972).

Here, the State's purported interest is to ban concealable knives that can be quickly opened to promote public safety. However, common folding knives are just as concealable and open faster than butterfly knives.[17] Post-*Heller*, the State cannot ban all self-defense knives as it implicitly concedes in its Motion for Summary Judgment. "HRS § 134-53 bans only butterfly knives... [i]t is not a complete ban on all knives...[t]herefore the regulation is tailored to the state's objective." *See* Defendants' MSJ at 13.

Singling out a knife while other equally or more dangerous knives remain legal is not sufficiently tailored to the State's purported interest. Additionally, it is not a "reasonable fit because, among other things, it prohibits law-abiding…weapon permit holders and law-abiding U.S Armed Forces veterans from acquiring" butterfly knives. *See Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1185, 2019 U.S. Dist. LEXIS 54597, *122. The State has failed to demonstrate its ban on butterfly knives actually promotes public safety, and even if it had, it has not shown that the ban is properly tailored.  For the above reasons, Hawaii's ban on butterfly knives fails intermediate scrutiny.

---

[17] *See* Burton Richardson's Declaration and video provided in Plaintiffs' Motion for Summary Judgment.

III.   <u>Conclusion</u>

As there are no genuine issues of material fact, this Court should deny the

Defendants' Motion for Summary Judgement and grant Plaintiffs' Motion for

Summary Judgment.

Respectfully submitted, this the <u>30</u><u>th</u> day of March, 2020.

*/s/ Alan Beck*
Alan Alexander Beck

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
*Admitted Pro Hac Vice*