Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 4008
Madison, MS 39130
(601) 852-3440
stephen@sdslaw.us
MS Bar No. 102784
*Admitted Pro Hac Vice
Attorneys for Plaintiffs
ANDREW TETER & JAMES GRELL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANDREW TETER and JAMES GRELL<br><br>Plaintiffs,<br><br>v.<br><br>CLARE E. CONNORS, in her Official Capacity as the Attorney General of the State of Hawaii and AL CUMMINGS in his Official Capacity as the State Sheriff Division Administrator<br><br>Defendants. | Civil No. 1:19-cv-00183 ACK-WRP<br><br>REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; CERTIFICATE OF SERVICE<br><br>HEARING: April 28, 2020 11AM<br>TRIAL: June 16, 2020 9AM<br>JUDGE: Hon. Alan C. Kay |

**<u>PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

I. Introduction

Defendants' Opposition to Plaintiffs' Motion for Summary Judgment has largely already been briefed by Plaintiffs in Plaintiffs' Response to Defendants' Motion for Summary Judgment [*See* ECF No. 50, 51]. In order to not burden the record, Plaintiffs incorporate the arguments made within their Opposition to Defendants' Motion for Summary Judgment as if made herein.

As an initial matter, Defendants' Concise Statement of Material Facts in Opposition and responses to Plaintiffs' Concise Statement are not defendable. Defendants denied everything except that butterfly knives are banned; that Lt. Nagamine (that Defendants' witness) testified that an "arm could be anything"; and then partially admitted where butterfly knives are illegal. *See* ECF# 53, pp.2-4. The remaining statements were denied because "Defendants are without knowledge" or some variation. These are illegitimate responses. Defendants took no discovery or depositions in this case.

Plaintiffs included Declarations in their complaint and set forth various relevant facts in the concise statement and Defendants have produced no competent summary judgment evidence to dispute those facts. Because Defendants have had ample opportunity to attempt to dispute those facts, the Court should treat these spurious denials as undisputed pursuant to Rule 56(e)(2).

II. Response to Defendants' Opposition

1

Defendants wrongfully assert that Plaintiffs' only claim is a "facial challenge to the constitutional validity of HRS § 134-53." *See* Opposition, p. 52, ECF# 52, PageID# 478.  In fact, Plaintiffs brought this challenge "as-applied and facial[ly] … to the applicable Hawaii laws which prevent them from owning butterfly knives." *See* Complaint, ¶ 26, ECF# 1, PageID# 7.  *See also Id.*, ¶¶ 105, 112.

Defendants devote a small portion of their Opposition discussing where the butterfly knife originated.[1]  Both the Plaintiffs' Expert and the Defendants' witness state it was invented in the Philippines.  *See* Plaintiffs' Concise Statement of Facts, ECF #34, ¶ 16, PageID# 187.  Defendants appear to dispute that, but in any event,

---

[1] Curiously, the next case cited by Defendants adopted the position that the butterfly knife originated in the Philippines: "The subject knife of this lawsuit, the Balisong or 'butterfly' knife, originated in the Philippines several hundred years ago. Although varied in style and design, the Balisong is basically a folding knife with a split handle. In the closed position, the two halves of the handle enclose the blade." *Taylor v. McManus*, 661 F. Supp. 11, 13 (E.D. Tenn. 1986) *reversed and injunction set aside by Taylor v. United States*, 848 F.2d 715, 720 (6th Cir. 1988)).

In the reversal, it is made obvious that the butterfly is not a switchblade because butterfly knives would be allowed to be imported (notwithstanding the Federal Anti-Switchblade Act because "The government indicated that had the knives been 'designed with a single-edge blade and were primarily used for utilitarian purposes' rather than 'double-edged stiletto-style blades'…" *Id*. If this case stood for the proposition that butterfly knives are switchblades, then the 6th Circuit would have held differently, and the government wouldn't have admitted they allow importation of certain butterfly knife designs.

the origin of the knife is immaterial to whether Hawaii can ban the butterfly knife and whether the butterfly knife receives Second Amendment protection.[2]

Defendants' citation to *Crowley Cutlery Co. v. United States*, 849 F.2d 273, 278 (7th Cir. 1988) does say that switchblades are more dangerous than regular knives "because they are more readily concealable and hence more suitable for criminal use." However, in the context of this case, the Court appears to be making a distinction in that plaintiff's argument, that the government would have to ban all knives, "including [the court supposes] the plastic knives provided on airlines and in prison cafeterias." *Id*. That court does not appear to state that switchblades are more dangerous than <u>folding knives, or butterfly knives, or pocketknives</u>, but instead more dangerous than say, a kitchen knife because a kitchen knife would be more difficult to conceal.

Defendants next citation to *United States v. Nelsen*, 859 F.2d 1318, 1320 (8th Cir. 1988) again relates to switchblades only. It should also be noted that this is a pre-*Heller* case that declined the defendant's invitation to conduct a true Second Amendment analysis, because at that time, cases held the Second Amendment

---

[2] The Defendants also cite to a September 12, 2019 alleged stabbing of Devy Gaorian by Jhovany Corpuz and a link which purports to stand for the proposition that the aggressor used a butterfly knife. This is clearly hearsay under FRE 801 and should be excluded under FRE 802. Defendants then link to a second source which is behind a paywall and did not attach any of the documents. The defendant in that matter appears to be set for trial on June 1, 2020.

protected militia activity and "Nelsen has made no arguments that the [switchblade Act] would impair any state militia…" *Id*. Again, Defendants cite to *Taylor v. McManus* trying to analogize switchblades and butterfly knives, but *Taylor* held otherwise (before it was reversed by the 6th Circuit as discussed *supra*). In fact, *Nelsen* actually cites to *Taylor* "finding 'butterfly' knives not covered by the [switchblade] Act." *Id*.

Defendants' multiple attempts to analogize switchblades and butterfly knives cannot pass muster. This Court needs to look no further than the Supreme Court of Hawaii's opinion in *In re Interest of Doe*, 73 Haw. 89, 828 P.2d 272 (1992). In that case, the Supreme Court of Hawaii analyzed the *Taylor* case and held that the butterfly knife was not prohibited under Hawaii's ban on switchblades and that the butterfly knife was not a knife "which [blade] opens automatically … by operation of inertia, gravity, or both[.]". *Id*. Because a butterfly knife isn't the same as a switchblade, attempts to equate them as equal fail.

Defendants take issue with Plaintiffs' reliance on *State v. Montalvo*, 162 A.3d 270 (2017) because "the case did not involve possession of a machete, but the illegal brandishing of a weapon." *See* Opposition, p. 17, [PageID # 493]. This is not an entirely accurate statement. Montalvo answered his front door with a machete in his hand. *Id*. at 307. He was charged with the unlawful possession of a weapon and

4

possession of a weapon for an unlawful purpose. *Id.* The Supreme Court of New Jersey stated:

> We need only observe that the Second Amendment protects the right of individuals to possess weapons, including machetes, in the home for self-defense purposes. [*citing Heller*]. Thus, Montalvo had a constitutional right to possess the machete in his home for his own defense and that of his pregnant wife.

*State v. Montalvo*, 229 N.J. 300, 322-23, 162 A.3d 270, 283-84 (2017). The New Jersey court did not delve into whether Montalvo could have grabbed a kitchen knife, or any other knife, and did not attempt to articulate some different class of knives which Montalvo could have used. Montalvo used a machete and the court found it protected by the Second Amendment.

Defendants argue that butterfly knives are dangerous and unusual because butterfly knives are used for offensive purposes. *See* Opposition, p.6. Yet handguns, which can also be used for offensive purposes are specifically protected under *Heller*. Defendants' dangerous and unusual argument is predicated on this Court finding that a butterfly knife is as dangerous and unusual as "machine guns, silencers, and directional mines…" *See* Opposition, p. 7. But, as Justice Alito opined in his concurrence, "[a]s the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito., J. Concurrence). Defendants' position that butterfly knives are "unusual" is belied by the fact that a supermajority of states do not ban butterfly knives. And, the legislative

5

history states that "stores openly sell, and minors can readily purchase, butterfly knives…" *See* Opposition, p. 11. This is before the ban went into effect in 1999, but there can be no serious dispute that even in Hawaii before the ban, butterfly knives were common.

But if this Court were to consider Defendants' misplaced dangerous and unusual argument, it is worthy of its own analysis. The misuse of this historical term has even been applied to baseball bats. *People v. Liscotti*, 219 Cal. App. 4th Supp. 1, 162 Cal. Rptr. 3d 225, 2013 Cal. App. LEXIS 706, 2013 WL 4778660. If the Second Amendment does not apply to a baseball bat because it is too dangerous then the Second Amendment has no meaning.

The phrase dangerous and unusual is first found in the Statute of Northampton 2 Edw. 3, c. 3 (1328) and the lower courts misinterpretation of this phrase might be understandable if they were required to interpret 14th Century case law. However, even a cursory search of the phrase reveals that courts in the 20th century have already analyzed this phrase correctly.

The Supreme Court of North Carolina correctly interpreted the dangerous and unusual language in the historical context as to how it was originally understood. *See e.g. State v. Dawson*, 272 N.C. 535, 159 S.E.2d 1, 1968 N.C. LEXIS 699. In *District of Columbia v. Heller*, Justice Scalia wrote:

> [w]e also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of

6

> weapons protected were those "in common use at the time." 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

*Dist. of Columbia v. Heller*, 554 U.S. 570, 627, 128 S. Ct. 2783, 2817, 171 L. Ed. 2d 637 (2008).  The dangerous and unusual doctrine applies to the *manner* in which the right is exercised.  In this context, the Common Law's definition of "dangerous" was any item that could be used to take human life through physical force. ("[S]howing weapons calculated to take life, such as pistols or dirks, putting [the victim] in fear of his life … is … the use of dangerous weapons" *United States v. Hare*, 26 F. Cas. 148, 163 - 64 (C.C.D. Md.1818)). "Any dangerous weapon, as a pistol, hammer, large stone, &c. which in probability might kill B. or do him some great bodily hurt" *See Baron Snigge v. Shirton* 79 E.R. 173 (1607). In this context, "unusual" meant to use a protected arm in a manner which creates an affray. Timothy Cunningham's 1789 law dictionary defines an affray as "to affright, and it formerly meant no more, as where persons appeared with armour or weapons not usually worn, to the terror."

The longstanding prohibition on the carrying of "dangerous and unusual weapons" refers to types of conduct with weapons.  A necessary element of this common law crime of affray, to which the "dangerous and unusual" prohibition refers, had always required that the arms be used or carried in such manner as to terrorize the population, rather than in the manner suitable for ordinary self-defense.

7

*Heller*'s first source on the topic, Blackstone, offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769) (emphasis added). Blackstone referenced the 1328 Statute of Northampton, which, by the time of the American Revolution, English courts had long limited to prohibit the carrying of arms only with evil intent, "in order to preserve the common law principle of allowing 'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, DET. L. C. REV. 789, 795 (1982) (citing *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)). "[N]o wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people," by causing "suspicion of an intention to commit an[ ] act of violence or disturbance of the peace." TREATISE ON THE PLEAS OF THE CROWN, ch. 63, § 9 (Leach ed., 6th ed. 1788); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994).

*Heller*'s additional citations regarding the "dangerous and unusual" doctrine are in accord. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people*." James Wilson, WORKS OF THE

8

HONOURABLE JAMES WILSON (Bird Wilson ed., 1804) (footnote omitted) (emphasis added). "It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people*." John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added).

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land … But here it should be remembered, that in this country the constitution guar[]anties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also Heller*, at 588 n.10 (quoting same). It is the *manner* of how the right is exercised, not the type of weapon that is carried, that constitutes the crime.

"[T]here may be an affray … where persons arm themselves with dangerous and unusual weapons, in such manner as will naturally cause a terror to the people." William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271 (1826). But:

> it has been holden, that no wearing of arms is within [meaning of Statute of Northampton] unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending against the statute by wearing common weapons … in such places, and upon such occasions, in which it is the common fashion to make use of

9

>them, without causing the least suspicion of an intention to commit any act of violence, or disturbance of the peace.

*Id*. at 272.

The other treatises *Heller* cites in support of the "dangerous and unusual" doctrine are in accord, as are the cases *Heller* cites. *See O'Neill v. State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis added); *State v. Langford*, 10 N.C. (3 Hawks) 381, 383-384 (1824) (affray "when a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people*") (emphasis added); *English v. State*, 35 Tex. 473, 476 (1871) (affray "by terrifying the good people of the land"). In fact, one does not even need to be armed with a firearm to commit the crime of affray under the dangerous and unusual doctrine. *See State v. Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or innocent" depending on whether people alarmed).

### III. Conclusion

Butterfly knives are not "dangerous and unusual" and they are afforded Second Amendment protection. Under any level of heightened scrutiny, Defendants' ban fails, and as such, Defendants' Motion for Summary Judgment should be denied and Plaintiffs' Motion granted.

Respectfully submitted, this the 14th day of April, 2020.

*/s/ Alan Beck*
Alan Alexander Beck

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
*\*Admitted Pro Hac Vice*

11