IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

—————————————————————————
                                    )
ANDREW TETER and                    )
JAMES GRELL,                        )
                                    )
              Plaintiffs,           )
                                    )
      v.                            )  Civ. No. 19-00183-ACK-WRP
                                    )
CLARE E. CONNORS, in her            )
Official Capacity as the            )
Attorney General of the State       )
of Hawaii, and                      )
AL CUMMINGS, in his Official        )
Capacity as the State Sheriff       )
Division Administrator,             )
                                    )
              Defendants.           )
—————————————————————————

## ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING THE STATE'S MOTION FOR SUMMARY JUDGMENT

A decade ago, the United States Supreme Court decided United States v. Heller, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), in which it recognized for the first time an individual right under the Second Amendment to keep and bear arms. According to the Court, the "core" right under the Second Amendment is the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 634-35, 128 S. Ct. 2783. The landmark ruling did not clarify all the contours of Second Amendment jurisprudence, and it left open many questions for "future evaluation." Id. This case raises a question not clearly resolved by Heller. Specifically, it asks

- 1 -

the Court to determine the constitutionality of Hawai`i's ban on butterfly knives.

Plaintiffs Andrew Teter and James Grell ("Plaintiffs") challenge the constitutionality of Hawai`i Revised Statutes ("HRS") § 134-53(a), which bans the sale, possession, and carrying of "butterfly knives."  Under 42 U.S.C. § 1983 and 28 U.S.C. § 2201(a), Plaintiffs seek an order (1) finding that the statute violates their Second Amendment rights and (2) enjoining the statute from enforcement.  Defendants Clare E. Connors, in her Official Capacity as the Attorney General of the State of Hawai`i, and Al Cummings, in his Official Capacity as the State Sheriff Division Administrator (collectively, the "State") contend that the statute does not implicate Second Amendment protections in the first place and that, even if it did, it would pass constitutional muster.  For the reasons detailed below, the Court finds that HRS § 134-53(a) is not an unconstitutional restriction on the right to bear arms.  The Court therefore DENIES Plaintiffs' Motion for Summary Judgment, ECF No. 33, and GRANTS the State's Motion for Summary Judgment, ECF No. 36.

**BACKGROUND**

I.   **Statutory Background**

Hawai`i has banned the manufacture, sale, transfer, possession, and transport of butterfly knives for over twenty years.  The Hawai`i legislature passed HRS § 134-53 in 1999 in response to a Hawai`i Supreme Court decision, <u>In the Interest of Doe</u>, 73 Haw. 89, 828 P.2d 272 (1992), which held that butterfly knives were not encompassed in an existing ban on "switchblade knives," HRS § 134-52.  <u>See</u> Haw. Legis. S. Comm. on Judiciary, Standing Comm. Report No. 1389 (1999), ECF No. 37-6, at pp. 27–29 of 46 ("Legis. Comm. Report No. 1389"); Haw. Comm. on Conf., Conf. Comm. Report No. 88 (1999), ECF No. 37-6, at pp. 35–37 of 46 ("Conf. Comm. Report No. 88").  The legislature passed HRS § 134-53 to impose an identical ban on butterfly knives:

> (a)  Whoever knowingly manufactures, sells, transfers, possesses, or transports in the State any butterfly knife, being a knife having a blade encased in a split handle that manually unfolds with hand or wrist action with the assistance of inertia, gravity or both, shall be guilty of a misdemeanor.

HRS § 134-53(a).[1]  <u>Compare</u> <u>id.</u>, <u>with</u> <u>id.</u> § 134-52(a) (banning switchblades).  When it passed the law, the legislature gathered evidence and community input supporting and opposing the law,

---

[1]  Subsection (b) of HRS § 134-53 makes the use or threatened use of a butterfly knife in the commission of a crime a class C felony.  Plaintiffs' challenge is limited to subsection (a), the more general ban on butterfly knives.  <u>See</u> Pls.' Mot. 1.

and made findings that butterfly knives—like switchblades—are often associated with gang activity and present a danger to the public:[2/]

- "Your Committee received testimony in support of this bill from the Honolulu Police Department, the Department of the Prosecuting Attorney for the City and County of Honolulu, and concerned individuals.  Comments were received from the Office of the Public Defender."  Haw. Legis. S. Comm. on Judiciary, Standing Comm. Report No. 731 (1999), ECF No. 37-6, at pp. 13-16 of 46 ("Legis. Comm. Report No. 731").

- "Your Committee finds that particular attention needs to be given to butterfly knives by setting them apart from other deadly or dangerous weapons.  In particular, the prohibitions against butterfly knives should be similar to that of switchblade knives."  Conf. Comm. Report No. 88; see also Legis. Comm. Report No. 731.

- "Your Committee finds that certain types of knives, particularly switchblade and butterfly knives, are associated with gang activity."  Legis. Comm. Report No. 1389.

- "[Honolulu Police Department's] Gang Detail has noticed an increasing trend in minors and gang members armed with knives and daggers.  Butterfly knives are preferred as they are easy to conceal and are more intimidating when brandished. . . .  Letter from George McKeague, Captain, Criminal Investigation Div., Police Dep't for City & Cty. of Honolulu to S. Comm. on Judiciary (Mar. 16, 1999), ECF No. 37-6, at p. 25 of 46 ("HPD Letter").

- "Recently, it has been publicized that certain vendors at local flea markets and in Waikiki have been selling butterfly knives to very young minors. . . .  We

---

[2/] See generally Ex. E to State's Mot., ECF No. 37-6.

believe there is sufficient justification
to prohibit the manufacture, sale or
transfer of such weapons to anyone, not just
minors."   Letters from Dep't of the
Prosecuting Attorney of the City & Cty. of
Honolulu to House Comm. on Judiciary (Feb.
5, 1999 & Mar. 16, 1999), ECF No. 37-6, at
pp. 12 & 23-24 of 46; ("Letters from Dep't
of the Prosecuting Attorney").

## II.   Butterfly Knives

A butterfly knife (sometimes call a "balisong") is a
type of folding knife that most likely originated in the
Philippines, although there is some conflicting evidence that it
originated in France.  Pls.' Mot. 2; State's Mot. 4; see also
Decl. of Pls.' Expert Burton Richardson, ECF No. 34-4
("Richardson Decl.") ¶ 4; Report of Pls.' Expert Burton
Richardson, ECF No. 34-5 ("Richardson Report") at p. 1; Dep. of
State's Witness Lieutenant Robin Nagamine, ECF No. 34-6
("Nagamine Dep.") at p. 26.  It is known for its interesting
appearance when opened—resembling a butterfly—and its unique
design.  Pls.' Mot. 1 n.1.  The design allows the knife to be
opened or closed with one hand, which is impressive and
intriguing to the user or observer.  Richardson Decl. p. 2.  The
same features that make the butterfly knife interesting to watch
also give it an intimidating and threatening effect.  See Id.
(indicating that manner of use is "designed to intimidate and
dissuade"); State's Mot. 3 ("Butterfly knives are . . . more
intimidating when brandished."); The Art of the Butterfly Knife,

- 5 -

Ex. I to State's Mot., ECF No. 37-10 (noting the "threatening nature and quick deployment" of a butterfly knife).  At the same time, butterfly knives open slightly more slowly than other modern knives, and it typically takes some practice to use one properly.  See Richardson Decl. at pp. 3-6; Richardson Report at pp. 3-5; Knives Deal, Ex. F to State's Mot. ECF No. 37-7, at p. 3.

According to Plaintiffs' expert, butterfly knives are used for self-defense, in certain martial arts circles, and sometimes as a pocket utility knife.  See generally Richardson Decl.  Evidence submitted by the State likewise reflects those uses.  On the other hand, as detailed above, the State has also submitted evidence showing that butterfly knives are popular with minors and with criminals and gang members.  See HPD Letter; Conf. Comm. Report No. 88; Legis. Comm. Report No. 731.

Butterfly knives are legal to some extent in the majority of states, but in many they are restricted or else banned altogether.  Pls.' Mot. 4; see also The Art of the Butterfly Knife, supra.  In some states, butterfly knives are viewed as falling within the statutory definition of a switchblade, and thus covered under those bans.  State's Mot. 9-10 & n.1-2 (collecting cases).  The record does not contain empirical evidence about the popularity of butterfly knives, including to what extent they are possessed on a national scale.

The record does include some, mostly anecdotal, evidence that butterfly knives are quite popular in certain villages in the Philippines, see Richardson Report at pp. 1–2; Nagamine Dep. at 26:5–18, and that knives in general are one of the most popular and most commonly-owned weapons in the United States, see Pls.' Mot. 4; Pls.' Opp. 1–2, 16.

### III. Procedural Background

On April 10, 2019, Plaintiffs sued the Attorney General of the State of Hawai`i and the State Sheriff Division Administrator challenging the constitutionality of HRS § 134-53(a). Compl., ECF No. 1. Plaintiffs are residents of Hawai`i who "wish[] to purchase a butterfly knife for self-defense and other purposes in their home and would acquire, possess, carry and where appropriate use a butterfly knife to protect themselves and their homes." Pls.' Mot. 1. Neither Plaintiff alleges that he has been charged with a crime under HRS § 134-53(a). See Compl. ¶¶ 86–93, 96–101.

Plaintiffs filed their Motion for Summary Judgment and concise statement of facts ("CSF") on January 14, 2020, and the State filed its cross-Motion for Summary Judgment and CSF the next day. See Pls.' Mot.; Pls.' CSF, ECF No. 34; State's Mot.; State's CSF, ECF No. 37. The State filed its memorandum and CSF in opposition to Plaintiffs' Motion on April 7, ECF Nos. 52 & 53, and Plaintiffs filed their reply in support of their Motion

one week later, ECF No. 58.  Meanwhile, Plaintiffs filed their memorandum and CSF in opposition to the State's Motion on March 30, ECF Nos. 50 & 51, and the State filed its reply in support of its Motion on April 14, ECF No. 57.  In addition to the parties' briefing, Amicus Curiae Hawaii Firearms Coalition filed a brief in support of Plaintiffs, ECF No. 45, and Amicus Curiae Everytown for Gun Safety Support Fund filed a brief in support of the State, ECF No. 47.  A telephonic hearing on the cross-motions was held on Tuesday, April 28, 2020.

## STANDARD

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Federal Rule of Civil Procedure 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see also Broussard v. Univ. of Cal., 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery

responses that demonstrate the absence of a genuine issue of material fact."  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citing Celotex, 477 U.S. at 323, 106 S. Ct. 2548); see also Jespersen v. Harrah's Operating Co., 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citation and internal quotation marks omitted and emphasis removed); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2509-10 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law."  In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008) (citing Anderson, 477 U.S. at 248, 106 S. Ct. at 2510).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the

nonmoving party.  <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587, 106 S. Ct. 1348.

## DISCUSSION

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  "Second Amendment jurisprudence has changed substantially in the wake of the Supreme Court's landmark decision in <u>Heller</u>."  <u>Fyock v. Sunnyvale</u>, 779 F.3d 991, 996 (9th Cir. 2015).  The Supreme Court decided <u>Heller</u> in 2008, announcing for the first time that the Second Amendment confers "an individual right to keep and bear arms" under the Second Amendment.  554 U.S. at 595, 128 S. Ct. 2783.

As noted, the parties' cross-motions ask this Court to decide the constitutionality of Hawai`i's ban on butterfly knives.  The parties not only disagree on whether the statute is lawful; they also quarrel over the appropriate inquiry to reach their respective conclusions.  Plaintiffs think that the inquiry ought to consider whether HRS § 134-53(a) is so broad as to be categorically unconstitutional.  Pls.' Mot. 12-15.  Conversely, the State maintains that the inquiry should contemplate whether the regulated activity is deserving of no Second Amendment

protection in the first place.  State's Mot. 6–12.  Assuming the case is not resolved by the answers to those questions, the parties differ on the level of scrutiny that should follow. Plaintiffs urge the Court to apply strict scrutiny, Pls.' Mot. 15, while the State views the statute as only implicating intermediate scrutiny, State's Mot. 12.  And finally, the parties unsurprisingly disagree on whether HRS § 134-53(a) is justified under whatever level of scrutiny ultimately applies. Compare Pls.' Mot. 20–24, with State's Mot. 13–14, and State's Opp. 15–17.

        With this backdrop in mind, the Court begins by addressing a threshold issue regarding the remedy sought by Plaintiffs.  The Court then turns to applying the Second Amendment framework that has taken shape since Heller.  As detailed below, the Court holds that HRS § 134-53(a) is constitutionally sound.

## I.   Facial Versus As-Applied Challenge

        Before turning to the merits, the Court finds it prudent to clarify the scope of Plaintiffs' challenge and the remedy they seek.  While they do not allege that they have been charged with violating HRS § 134-53(a), Plaintiffs purport to bring an as-applied and facial challenge.  Compl. ¶ 26; Pls.' Reply 2.  Upon the Court's questioning at the hearing, Plaintiffs reluctantly conceded that their challenge must be

facial.  Yet they still insist that the Court find the statute unconstitutional _only_ as applied to law-abiding citizens seeking to possess butterfly knives in their homes or to openly carry them in public.

The Court cannot rewrite a statute.  Although Plaintiffs' primary concern is their own ability to legally use butterfly knives in certain contexts, the language of the statute is such that the Court could not salvage one part of the statute while invalidating another.  HRS § 134-53(a) is one clause completely and categorically banning the manufacturing, sale, transfer, possession, and transport of butterfly knives in any context.  The Court cannot write in an exception to the otherwise complete ban to allow for possession in the home or open carry, by only law-abiding citizens.  Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 329–30 (2006); see also Jackson v. City & Cty. of San Francisco, 746 F.3d 953, 962 (9th Cir. 2014) (explaining that a "flat prohibition" "does not give courts the opportunity to construe the prohibition narrowly or accord the prohibition a limiting construction to avoid constitutional questions" (citation and internal quotation marks omitted)).

Thus, the Court construes Plaintiffs' claim as seeking a declaration that HRS § 134-53(a) is unconstitutional on its face.  This distinction ultimately makes no practical difference

given the Court's conclusion that the statute is constitutional anyway.

## II. Second Amendment Framework

### a. Heller and Subsequent Supreme Court Cases

In Heller, the Supreme Court conducted an extensive textual and historical analysis of the Second Amendment from which it gleaned an individual right to keep and bear arms. 554 U.S. at 595, 128 S. Ct. 2783. Heller emphasized the "core" protection of the Second Amendment: "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 634–35, 128 S. Ct. 2783.

Alongside its landmark ruling recognizing an individual right under the Second Amendment, the Court clarified that the right is "not unlimited." Id. at 626, 128 S. Ct. 2783; see also Fyock, 779 F.3d at 996 ("The Supreme Court has emphasized that nothing in its recent opinions is intended to cast doubt on the constitutionality of longstanding prohibitions traditionally understood to be outside the scope of the Second Amendment."). The Court identified several contexts where prohibitions or other regulatory measures would be "presumptively lawful." Id. at 626–27 & n.26, 28 S. Ct. 2873. For example, the Court cautioned that its opinion should not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the

carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27, 128 S. Ct. 2783. Of significance here, Heller also endorsed the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" Id. (citation omitted). According to the Court, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." Heller, 554 U.S. at 624-25, 128 S. Ct. 2873.

Turning more narrowly to the specific facts before the Court, Heller involved a challenge to the District of Columbia's ban on the possession of operable handguns in the home. Id. at 575-76, 128 S. Ct. 2873. The Court first held as a threshold matter that handguns are plainly "bearable arms" under the Second Amendment. Id. at 581-82, 128 S. Ct. 2873. Next, the Court explained that handguns are commonly used for lawful purposes and therefore fall within the ambit of the Second Amendment. Id. at 628-29, 128 S. Ct. 2873. From there, the Court concluded that "[u]nder any of the standards of scrutiny that [the Court] ha[s] applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster." Id. (internal footnote, quotation marks, and citation omitted).

- 14 -

Heller stopped short of opining on the precise level of scrutiny courts should apply to Second Amendment challenges other than to say that rational basis is not appropriate. Id. at 628 n.27, 128 S. Ct. 2873.  The narrow takeaway from Heller, then, is that "[a] law that imposes such a severe restriction on the core right of self-defense that it 'amounts to a destruction of the [Second Amendment] right,' is unconstitutional under any level of scrutiny." Jackson, 746 F.3d at 961 (quoting Heller, 554 U.S. at 629, 128 S. Ct. 2873)).

Heller was obviously concerned that DC's handgun ban implicated the "core" Second Amendment right to self-defense in the home, where "the need for defense of self, family, and property is most acute." 554 U.S. at 628, 128 S. Ct. 2783.  Yet it was equally—if not more—concerned with another factor: the specific weapon at issue.  The Heller Court "repeatedly made comments underscoring the status of handguns as 'the most preferred firearm in the nation to keep and use for protection of one's home and family.'" Kolbe v. Hogan, 849 F.3d 114, 132 (4th Cir. 2017).  Here are a few examples:

- "The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]." Heller, 554 U.S. at 628, 128 S. Ct. 2783.
- "Under any of the standards of scrutiny that [the Court] ha[s] applied to enumerated constitutional rights,

banning from the home the most preferred
firearm in the nation to keep and use for
protection of one's home and family would
fail constitutional muster." <u>Id.</u>
(internal quotation marks and citation
omitted).

- "It is no answer to say . . . that it is
permissible to ban the possession of
handguns so long as the possession of
other firearms (i.e., long guns) is
allowed. It is enough to note . . . that
the American people have considered the
handgun to be the quintessential self-
defense weapon." <u>Id.</u> at 629, 128 S. Ct.
2783.

- "Whatever the reason, handguns are the
most popular weapon chosen by Americans
for self-defense in the home, and a
complete prohibition of their use is
invalid." <u>Id.</u>

<u>Heller</u> also "did not purport to clarify the entire

field of Second Amendment jurisprudence." <u>Jackson</u>, 746 F.3d at

959 (internal quotation marks and citation omitted).  And in the

decade since <u>Heller</u>, the Supreme Court has not taken the

opportunity to hear many Second Amendment cases.  The first of

only three cases came two years after <u>Heller</u> was decided.  The

Court in <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 130 S. Ct.

3020, 177 L. Ed. 2d 894 (2010), held that the Second Amendment

right is fully applicable to the states.  <u>Id.</u> at 750, 130 S. Ct.

3020.  Other than that, the case involved challenges to two

Chicago-area handgun bans and mostly echoed the same principles

established in <u>Heller</u>.  <u>See id.</u> at 749-50.  Several years later,

the Court decided a narrow issue in <u>Caetano v. Massachusetts</u>,

136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016), which involved a challenge to a Massachusetts law banning stun guns. The Court, in a short per curiam opinion, reiterated a few of Heller's points about what constitutes "bearable arms" and then remanded the case for further consideration of whether the Second Amendment protects stun guns. Id. at 1027-28. Finally, the Court just recently issued a decision in the third post-Heller Second Amendment case. The case was widely anticipated to meaningfully develop the Court's Second Amendment jurisprudence for the first time since Heller and McDonald. Instead, the City amended the challenged ordinance during the litigation, which mooted the case. See N.Y. State Rifle & Pistol Ass'n, Inc. v. City of N.Y., N.Y., -- S. Ct. -- 2020 WL 1978708 (Apr. 27, 2020) (per curiam). Aside from these three rulings, the Supreme Court has done little to amplify Heller's Second Amendment framework.[3/]

### b. Post-Heller Framework

"In the decade since Heller, the courts of appeals have spilled considerable ink in trying to navigate the Supreme Court's framework." Pena v. Lindley, 898 F.3d 969, 976 (9th Cir. 2018), petition for cert. docketed, Jan. 3, 2019. Most circuits, including the Ninth, have derived a series of two-part

---

[3/] There have, of course, been many attempts by litigants to put Second Amendment issues before the Supreme Court. Accordingly, some justices have issued dissenting or concurring opinions in response to denials of certiorari, in which they attempt to clarify or expand the scope of Heller. The Court need not comprehensively address those opinions here.

tests for analyzing post-Heller Second Amendment challenges. The relevant inquiry "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." United States v. Chovan, 735 F.3d 1127, 1136 (9th Cir. 2013).

At the first step, whether a law burdens conduct protected by the Second Amendment depends on a "historical understanding" of the scope of the Second Amendment right and consideration of "whether the law falls within a well-defined and narrowly limited category of prohibitions that have been historically unprotected." Jackson, 746 F.3d at 960 (internal quotation marks and citations omitted). As noted above, prohibitions on the carrying of "dangerous and unusual" weapons fall within that category and are thus "presumptively lawful." Heller, 554 U.S. at 627 & n.26, 128 S. Ct. 2783. It follows that, if a weapon is dangerous and unusual, it does not implicate the Second Amendment and the analysis ends there. If, however, a weapon is not dangerous and unusual and the regulation does not fall within any of the other "presumptively lawful regulatory measures" recognized in Heller, courts proceed to the second step and apply some form of means-end scrutiny. Chovan, 735 F.3d at 1136.

To determine the appropriate level of scrutiny, the Ninth Circuit uses another two-pronged test. The degree of

scrutiny depends on (1) "how close the law comes to the core of the Second Amendment right," and (2) "the severity of the law's burden on the right." Id. at 1138 (quoting Ezell v. City of Chicago, 651 F.3d 684, 703 (7th Cir. 2011)). If the law does not implicate the core Second Amendment right or does not substantially burden that right, then courts apply intermediate scrutiny; if the law implicates the core of the Second Amendment right and severely burdens that right, then a stronger justification—something like strict scrutiny—applies. See Jackson, 746 F.3d at 961.

The Court now undertakes to conduct this multi-step analysis to decide whether HRS § 134-53(a) violates the Second Amendment.

## III. Step 1: Whether the Second Amendment Applies

The first step of the two-step inquiry described above asks whether the challenged statute burdens conduct protected by the Second Amendment. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Heller, 554 U.S. at 582, 128 S. Ct. 2783. But the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. at 626, 128 S. Ct. 2783. Relevant here, Heller does not preclude certain "presumptively lawful regulatory measures" and

- 19 -

"longstanding prohibitions," including prohibitions on the carrying of "dangerous and unusual" weapons.  Id. at 626–27, 627 n.26, 128 S. Ct. 2783; see also United States v. Henry, 688 F.3d 637, 640 (9th Cir. 2012).  What this means here as a practical matter is that the Second Amendment does not protect butterfly knives unless they are (1) "bearable arms" and (2) not "dangerous and unusual weapons."

First, the parties seem to assume that butterfly knives are "bearable arms."  See State's Mot. 6 (beginning its analysis with the first step of whether butterfly knives fall within the "dangerous and unusual weapons" exception); Pls.' Mot. 3–4 (same).  In any event, the Court agrees that butterfly knives are indeed bearable arms as that term was defined in Heller and later clarified in Caetano.  See Heller, 554 U.S. at 581–82, 128 S. Ct. 2783 (defining bearable arms to mean "[w]eapons of offence, or armour of defence" and to include "weapons that were not specifically designed for military use and were not employed in a military capacity"); see also Caetano, 136 S. Ct. at 1028 (clarifying that protected arms need not have been in "common use" at the time the Second Amendment was enacted).

The more difficult question is whether butterfly knives are dangerous and unusual.  If they are, then they are not the type of "arms" meant to be protected by the Second

Amendment and HRS § 134-53(a)'s prohibition is "presumptively lawful." Jackson, 746 F.3d at 959 (citing Heller, 554 U.S. at 626-27, 627 n.26, 128 S. Ct. 2783).  To determine if a weapon is "dangerous and unusual," courts consider "whether the weapon has uniquely dangerous propensities and whether the weapon is commonly possessed by law-abiding citizens for lawful purposes."[4] Fyock, 779 F.3d at 640 (citing Henry, 688 F.3d at 640).  The inquiry is conjunctive, so a weapon must be both dangerous and unusual.  See Caetano, 136 S. Ct. at 1031 (Alito, J. concurring) (noting that the "relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes"); see also Fyock, 779 F.3d at 998 ("Although [the city] presented evidence regarding the increased danger posed by large-capacity magazines, it did not present significant evidence to show that large-capacity magazines are also 'unusual.'").

---

[4] Some courts have interpreted the "unusual" prong to also take into account whether a weapon is in "common use"—in other words, the popularity of the weapon.  See, e.g., N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 255 (2d Cir. 2015).  Others have focused not on whether weapons are commonly used, but whether they are commonly used for lawful purposes.  See, e.g., Maloney v. Singas, 351 F. Supp. 3d 222, 233-34 & n.16 (E.D.N.Y. 2018); see also Kolbe, 849 F.3d at 142 (rejecting the dissent's "popularity test" for deciding whether weapons are unusual).  And others still have somewhat combined the analysis to address both.  See, e.g., Fyock, 779 F.3d at 998.  The Court need not confront this problem because—as outlined below—even operating under the assumption that butterfly knives are protected arms under the Second Amendment, HRS § 134-53(a) survives intermediate scrutiny.  Cf. Kolbe, 849 F.3d at 142 (declining to resolve the "difficult questions raised by Heller concerning the interplay of 'in common use at the time,' 'typically possessed by law-abiding citizens for lawful purposes,' and 'dangerous and unusual'" (citing Heller, 554 U.S. at 625, 128 S. Ct. 2783)).

Heller established that handguns (1) are not so dangerous that they are outside the scope of the Second amendment and (2) are weapons commonly possessed by law-abiding citizens for lawful purposes.  But Heller does not easily answer the question now before this Court—whether butterfly knives would meet that same test.  The parties offer competing evidence about the features and typical use of butterfly knives. Plaintiffs contend that they are commonly possessed for protection in the home and for some martial arts practices. Pls.' Mot. 2-4, Pls.' Opp. 1-2.  The State, by contrast, characterizes them as a uniquely dangerous type of knife that is akin to a switchblade, popular in gangs, associated with street crime, and a risk to public safety.  State's Mot. 8-12.

Based on the record as it stands, the Court cannot be certain whether butterfly knives are typically used for self-defense or other lawful purposes.  In the absence of a stronger, more-developed factual record, the Court declines to decide one way or another whether butterfly knives are "dangerous and unusual" weapons not within the scope of the Second Amendment. The Court need not resolve that issue because, even assuming butterfly knives are the type of "arms" protected by the Second Amendment, the statute is nonetheless constitutional.[5/]

---

[5/]  This is consistent with the approach taken by some other courts (Continued . . . )

Operating under that assumption allows the Court to proceed straight to the application of tiered scrutiny, which in turn leads the Court to the conclusion that HRS § 134-53(a) survives under that standard anyway.  See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 257 (2d Cir. 2015) [hereinafter, "N.Y.S.R.P.A."] ("This assumption is warranted at this stage, because . . . the statutes at issue nonetheless largely pass constitutional muster." (footnote omitted)).  To summarize, the Court assumes without deciding that butterfly knives are protected "arms" within the scope of the Second Amendment and now turns to the second step of the inquiry.

IV.  **Step 2: Scrutiny Analysis**

Having now assumed that butterfly knives fall within the scope of the Second Amendment, the Court's next task is to determine and apply the appropriate scrutiny lens through which to view the challenged law.  Plaintiffs encourage the Court to apply a threshold "categorical approach" that would bypass

---

considering the constitutionality of bans on weapons other than handguns (in other words, in cases also not clearly resolved by Heller).  See, e.g N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 257 (2d Cir. 2015) ("In the absence of clearer guidance from the Supreme Court or stronger evidence in the record, we . . . assume for the sake of argument that these 'commonly used' weapons and magazines are also 'typically possessed by law-abiding citizens for lawful purposes.'" (footnote omitted)); Heller v. District of Columbia, 670 F.3d 1244, 1260-61 (D.C. Cir. 2011) ("We need not resolve that question [whether certain semiautomatic weapons are commonly used for lawful purposes], however, because even assuming they do impinge upon the right protected by the Second Amendment, we think intermediate scrutiny is the appropriate standard of review and the prohibitions survive that standard.").

scrutiny review altogether.  Pls.' Mot. 12-15.  In the alternative, they assert that strict scrutiny would apply, but they maintain that the statute fails under any level of scrutiny.  Id. at 20-24.  As for the State, it invites—at most—intermediate scrutiny.[6/]  State's Mot. 12-14.

As discussed, Heller did not specify the appropriate level of scrutiny applicable to Second Amendment challenges. All that is clear from Heller is that (1) rational basis is not appropriate, (2) some degree of heightened scrutiny applies, and (3) categorical bans on possessing operable handguns at home are so severely burdensome that they fail under any level of scrutiny.  To fill the gaps in Heller, circuit courts have established a two-part test to decide the appropriate degree of scrutiny.  Courts consider "(1) how closely the law comes to the core of the Second Amendment right; and (2) how severely, if at all, the law burdens that right."  Fyock, 779 F.3d at 998-99 (citing Chovan, 735 F.3d at 1138).

### a. Plaintiffs' "Categorical Approach"

Plaintiffs first urge the Court to apply what they call a "categorical approach."  Pls.' Mot. 13.  Plaintiffs rely on Heller and a handful of other cases to advocate for an approach that would find HRS § 134-53(a) categorically

---

[6/]  In fact, the State in its Opposition to Plaintiffs' Motion does not even address whether the law would pass muster under strict scrutiny.

unconstitutional, "without [the Court] bothering to apply tiers of scrutiny."  Pl. Mot. 13–15 (collecting cases).  The Court does not read Heller and the subsequent case law this way.  And even to the extent that Heller supports an approach that would bypass the scrutiny analysis in certain cases, this is not one of those cases.

Heller does not stand for the proposition that no level of scrutiny should be applied at all.  Rather, Heller—on the particular facts at issue—viewed the handgun ban as so severely burdening the core Second Amendment right to self-defense in the home that the statute would fail under any level of scrutiny the Court might apply.  See Heller, 554 U.S. at 628–29, 128 S. Ct. 2783.  The Second Circuit made this point when declining to circumvent the scrutiny analysis in a case challenging the constitutionality of bans on semiautomatic weapons and large-capacity magazines:

> Heller's reluctance to announce a standard of review should not be interpreted as a signal that courts must look solely to the text, history, and tradition of the Second Amendment to determine whether a state can limit the right without applying any sort of means-end scrutiny.  On the contrary, Heller indicated that the typical standards of scrutiny analysis should apply to regulations impinging upon Second Amendment rights, but that D.C.'s handgun ban would fail [u]nder any of the standards of scrutiny.

N.Y.S.R.P.A., 804 F.3d at 257 n.74 (internal quotation marks and citations omitted) (alterations in N.Y.S.R.P.A.).  The Second Circuit's interpretation accords with Ninth Circuit precedent. See Jackson, 746 F.3d at 961 (explaining that a law imposing "such a severe restriction" on the core Second Amendment right is unconstitutional "under any level of scrutiny"); see also Fotoudis v. City & Cty. of Honolulu, 54 F. Supp. 3d 1136, 1144 (D. Haw. 2014) (finding a statutory ban unconstitutional under any level of scrutiny).  Accordingly, Plaintiffs' argument that the Court should avoid scrutiny review altogether finds no support in Heller or this circuit's case law.

Plaintiffs also argue that the butterfly knife ban in HRS § 134-53(a) is like the handgun ban in Heller and therefore fails under any level of scrutiny that might apply.  The Court rejects that rubric as well.  Whatever Heller left open to interpretation, it made clear that the type of weapon being regulated (there, the handgun) factors into the analysis.  See Heller, 554 U.S. at 628-29, 128 S. Ct. 2783.  With that in mind, the Court is not convinced that Heller's approach to analyzing a ban on handguns (i.e., concluding at the outset that it would fail under any standard of scrutiny) would apply with equal force to a ban on butterfly knives.  It is true that Heller and this case both involve what are essentially categorical bans on a type of weapon.  But "[t]he fact that the statute effects a

- 26 -

categorical ban is not, of itself, decisive." _State v. Murillo_, 347 P.3d 284, 290 (N.M. Ct. App. 2015).  The Court declines to treat _Heller_ as "containing broader holdings than the [Supreme] Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping _operable handguns_ at home for self-defense." _United States v. Skoien_, 613 F.3d 638, 640 (7th Cir. 2010) (emphasis added).

Plaintiffs' theory of a categorical approach under _Heller_ contains two fatal flaws.[7]  First, HRS § 134-53(a) is not a ban on an entire "class of 'arms,'" as was the case in _Heller_. _Heller_, 554 U.S. at 628, 128 S. Ct. 2783.  Second, Plaintiffs disregard _Heller_'s unique concerns about handguns.  Put another way, their theory overlooks not only that handguns are an "entire class of 'arms,'" but also that they are "an entire class of 'arms' _that is overwhelmingly chosen by American society for th[e] lawful purpose [of self-defense]_." _Heller_, 554 U.S. at 628, 128 S. Ct. 2783 (emphasis added); _see also Kolbe_, 849 F.3d at 138-39 (declining to apply the _Heller_ approach to invalidate a ban on assault weapons); _Heller v. District of Columbia_, 670 F.3d 1244, 1268 (D.C. Cir. 2011) [hereinafter, "_Heller II_"] ("We simply do not read _Heller_ as foreclosing every ban on every possible sub-class of handguns

---

[7]  In fact, these same flaws also apply to Plaintiffs' faulty argument that strict—rather than intermediate—scrutiny should apply, which the Court discusses _infra_.

or, for that matter, a ban on a sub-class of rifles."); Worman
v. Healey, 922 F.3d 26, 38 n.6 (1st Cir. 2019) (noting its
disagreement with the idea that "any law that restricts a
certain type of arms is per se unconstitutional"), petition for
cert. docketed, Sept. 25, 2019.

HRS § 134-53(a) only bans one variation of a type of
folding knife.  In that sense, only a "small subset of knives"
is affected here.  Murillo, 347 P.3d at 288.  In Heller, on the
other hand, the ban impacted an entire class of weapons within
which exist varying sizes, models, and capacities.  Accordingly,
the Court cannot say that this case implicates the same Second
Amendment concerns as Heller.

More critically, Heller made much of the fact that the
banned class of weapons was a handgun—the "quintessential self-
defense weapon" of choice.  Heller 554 U.S. at 629, 128 S. Ct.
2783.  The butterfly knife is "not nearly as popularly owned and
used for self-defense as the handgun."  N.Y.S.R.P.A., 804 F.3d
at 258 (analyzing ban on semiautomatic weapons and large-
capacity magazines); see also Amicus Br. of Everytown for Gun
Safety Support Fund ("Everytown Amicus Br.") at 4 (noting that
the handgun class in Heller consisted of 114 million arms)
(citing William J. Krause, Gun Control Legislation,
Congressional Research Service, at 8 (Nov. 14, 2012)).
Plaintiffs do not even try to argue as much.  See Everytown

Amicus Br. at 5 n.3 (noting that the record "contains no evidence at all as to the number of butterfly knives possessed by law-abiding citizens"). In an attempt to invoke <u>Heller</u>, they instead shift their focus to the popularity of knives generally. <u>See</u> Pls.' Mot. 4 ("[K]nives are widely owned in every state in the Union."); Pls.' Opp. 16 ("And knives . . . are as quintessential to self-defense as handguns."). The Court finds Plaintiffs' arguments unpersuasive. The popularity of an all-encompassing class of weapon (the knife, or even the folding knife) is immaterial when only one narrow subset of the class (the butterfly knife) is banned here. The Court declines to treat the ban on butterfly knives—a relatively obscure weapon—the same way the <u>Heller</u> Court viewed the ban on handguns—the "quintessential" self-defense weapon. Doing so would neglect the Supreme Court's emphasis on the regulated weapon at issue—and by extension much of the Court's reasoning that led to its ultimate holding.

This case simply does not amount to the same level of "destruction of the [Second Amendment] right" as <u>Heller</u>. <u>See</u> <u>Jackson</u>, 746 F.3d at 961 (quoting <u>Heller</u>, 554 U.S. at 629, 128 S. Ct. 2873)). The Court therefore declines Plaintiffs' invitation to find HRS § 134-53(a) categorically or per se

unconstitutional under Heller.  To the contrary, some form of tiered scrutiny applies.[8/]

### b. Level of Scrutiny

A recent Ninth Circuit decision summarized the appropriate circumstances for applying intermediate versus strict scrutiny in the Second Amendment context:  "We strictly scrutinize a law that implicates the core of the Second Amendment right and severely burdens that right.  Otherwise, we apply intermediate scrutiny if the law does not implicate the core Second Amendment right or does not place a substantial burden on that right."  Pena, 898 F.3d at 977 (internal quotation marks and citations omitted).  Most post-Heller decisions have landed on some form of intermediate scrutiny. Id.; see also Murillo, 347 P.3d at 288 (collecting cases and noting that "federal circuits have developed a consensus to the extent that some form of intermediate scrutiny is appropriate"). Indeed, the Court is not aware of—and Plaintiffs have not

---

[8/]  Admittedly, some courts have taken a different view and held that a categorical ban of a type of weapon automatically fails.  See, e.g. Maloney, 351 F. Supp. 3d at 238-39 (declining to decide whether intermediate or strict scrutiny applied because the ban failed under the more deferential intermediate scrutiny standard anyway); State v. Hermann, 873 N.W.2d 257, 321-22 (Wisc. Ct. App. 2015) (same).  In the Court's view, those cases have read Heller too broadly.  Absent further clarification from the Supreme Court on Heller's intended scope, this Court declines to extend the Supreme Court's reasoning for invalidating a ban on handguns to invalidate a ban on butterfly knives.  As discussed above, several state and federal decisions issued since Heller support this reading.

provided—any Ninth Circuit cases applying strict scrutiny in the Second Amendment context.  See Everytown Amicus Br. at 8 & n.4.

     The Court begins its scrutiny analysis by contemplating how closely HRS § 134-53(a) comes to the "core" Second Amendment right.  Heller stated that the Second Amendment has "the core lawful purpose of self-defense" and that "whatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  Jackson, 746 F.3d at 961 (quoting Heller, 554 U.S. at 630, 635, 128 S. Ct. 2783) (alteration in Jackson); see also Fyock v. City of Sunnyvale, 25 F. Supp. 3d 1267, 1271 (N.D. Cal. 2014) (finding that a ban on possession of certain-capacity magazines was constitutional in part because the banned magazines were "hardly central to self-defense"), aff'd 779 F.3d 991 (9th Cir. 2015); Fisher v. Kealoha, Civ. No. 11-00589-ACK-BMK, 2012 WL 2526923, at *8 (D. Haw. June 29, 2012) (explaining that the Second Amendment right is "particularly acute with respect to the right to self-defense in the home").

     Here, HRS § 134-53(a)'s prohibition undoubtedly extends into the home, "where the need for defense of self, family, and property is most acute."  Heller, 554 U.S. at 628, 128 S. Ct. 2783.  In that sense, the butterfly knife ban implicates the core Second Amendment right (which is also

- 31 -

consistent with the Court's assumption, _infra_, that the Second Amendment extends to butterfly knives).  On the other hand, Plaintiffs cannot seriously contend that butterfly knives implicate the "core" right to the same extent as the handguns _Heller_.  As the Court touched on earlier, _Heller_ underscored not just that the challenged law precluded possession of a weapon in the home, but also that the ban precluded possession of the handgun—the "quintessential" self-defense weapon.  _Id._ at 628-29, 128 S. Ct. 2783.  The record does not indicate that butterfly knives are nearly as popular a choice of weapon for self-defense in the United States.  So while the Court recognizes that HRS § 134-53(a) implicates the "core" Second Amendment right to self-defense in the home (again, consistent with its earlier assumption that the Second Amendment applies to butterfly knives), it does not do so to the same extent as the laws challenged in _Heller_.  _See N.Y.S.R.P.A._, 804 F.3d at 258 (holding that a ban on civilian machine guns did not implicate "core" right to the same extent as the _Heller_ ban on handguns).

       For similar reasons, the Court also finds that the statute does not severely burden the core Second Amendment right.  For purposes of this prong, the Court considers the subject and scope of the regulation.  The analysis is often compared to First Amendment time-place-manner principles.  _See Jackson_, 746 F.3d at 960-61.  "[S]evere burdens" that "don't

leave open ample alternative channels" trigger something like strict scrutiny, while regulations that leave open such channels are "modest burdens" requiring only a "mild form of intermediate scrutiny." Heller II, 670 F.3d at 1262 (citation omitted); see also Jackson, 746 F.3d at 961 (noting that regulations that "leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not"); N.Y.S.R.P.A., 804 F.3d at 259 ("The scope of the legislative restriction and the availability of alternatives factor into our analysis of the 'degree to which the challenged law burdens the right.'" (quoting United States v. Chester, 628 F.3d 673, 682 (4th Cir. 2010))).

Applying these principles, HRS § 134-53(a) is broad in the sense that it is an outright ban. It does not merely regulate the time, place, or manner of possession or use of butterfly knives. With that said, the ban does not prohibit an "entire class" of arms, let alone a class of arms that is "overwhelmingly chosen" for the "lawful purpose" of self-defense. See Heller, 554 U.S. at 628, 128 S. Ct. 2783. HRS § 134-53(a) bans only a "small subset of knives, which are themselves a peripheral subset of arms typically used for self-defense or security." Murillo, 347 P.3d at 288 (applying intermediate scrutiny to assess constitutionality of ban on switchblades); see also N.Y.S.R.P.A., 804 F.3d at 260 (applying

- 33 -

similar reasoning to a ban on semi-automatic weapons); Kolbe, 849 F.3d at 138-39 ("[T]he banned assault weapons cannot fairly be said to be a 'class' like that encompassing all handguns, in that the banned assault weapons are just some of the semiautomatic rifles and shotguns in existence."). Thus, while Plaintiffs would have the Court characterize HRS § 134-53(a) as prohibiting an entire class of arms (butterfly knives), it "might equally be characterized as a ban on a mere subset [butterfly knives] of a type of arms (knives) that is itself peripheral to self-defense or home security." Murillo, 347 P.3d at 290.

Likewise problematic for Plaintiffs is the same hurdle they faced in pushing their "categorical approach": Heller's prominent discussion of the handgun. Unlike the ban in Heller, the ban here does not prohibit an "entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose of self-defense." Heller, 554 U.S. at 628, 128 S. Ct. 2783. Heller gave "special consideration" to the categorical ban on handguns because handguns are "the most popular weapon chosen by Americans for self-defense in the home." United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No.: LW001804, 822 F.3d 136, 144 (3d Cir. 2016) (quoting Heller, 554 U.S. at 629, 128 S. Ct. 2783). It simply does not follow from Heller that a ban on

- 34 -

any type of bearable arm would automatically be subject to strict scrutiny.

This conclusion is bolstered by the many alternative channels Plaintiffs have for defending themselves in their homes.  Even with the butterfly knife ban in effect, Plaintiffs and other law-abiding citizens are free to arm themselves with other types of knives, or with handguns and other protected weapons.  The butterfly knife ban "does not effectively disarm individuals or substantially affect their ability to defend themselves."  Heller II, 670 F.3d at 1262; see also Koble, 849 F.3d at 139 (quoting the same language to hold that assault weapon and large-capacity magazine ban would be subject to intermediate scrutiny).  Where that is the case, courts have regularly held that intermediate scrutiny is appropriate.  See, e.g., N.Y.S.R.P.A., 804 F.3d at 260 (applying intermediate scrutiny to ban on semi-automatic rifles and large-capacity magazines because "[t]he burden imposed by the challenged legislation is real, but it is not 'severe'"); Heller II, 670 F.3d 1262 (applying intermediate scrutiny because the ban allowed for other self-defense alternatives).

What matters for determining the appropriate level of scrutiny is "(1) the degree of the burden placed on the right to keep and bear arms, which, in this case, is unsubstantial and (2) the distance from the core of the right, which, this case,

- 35 -

is remote." Murillo, 347 P.3d at 290.  For these reasons, the Court concludes that while HRS § 134-53(a) may reach the core Second Amendment right of self-defense in the home, it is a modest infringement.  That being the case, intermediate scrutiny is appropriate.

### c. Application of Intermediate Security

The Court must next determine whether HRS § 134-53(a) survives intermediate scrutiny.  As detailed below, the Court finds that the State's justifications are sufficient and the ban on butterfly knives passes constitutional muster.

To survive intermediate scrutiny in the Second Amendment context, the Ninth Circuit requires "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective."  Chovan, 735 F.3d at 1139.  Here, the State's justification for enacting HRS § 134-53(a) is "to protect public safety by reducing access to [butterfly knives] by criminal gang members."  State's Mot. 13. "It is 'self-evident' that [the State]'s interests in promoting public safety and reducing violent crime are substantial and important government interests."  Fyock, 779 F.3d at 1000 (citing Chovan, 735 F.3d at 1139).  Thus, the Court need only decide whether HRS § 134-53(a) reasonably fits the achievement of those interests.  Consistent with the discussion below, the

Court finds that the State has met its burden of establishing a reasonable fit between the butterfly knife ban and the achievements of its public safety objectives.

      To establish a "reasonable fit" between a statute and the government interests, the government need not show that the statute is the least restrictive means of achieving its interest. Jackson, 746 F.3d at 966 (citing Ward v. Rock Against Racism, 491 U.S. 781, 798, 109 S. Ct. 2746, 105 L.Ed.2d 661 (1989)). Instead, it need only show that the statute "promotes a 'substantial government interest that would be achieved less effectively absent the regulation.'" Fyock, 779 F.3d at 1000 (quoting Colacurcio v. City of Kent, 163 F.3d 545, 553 (9th Cir. 1998)). As far as evidence, courts may consider "the legislative history of the enactment as well as studies in the record or cited in pertinent case law." Jackson, 746 F.3d at 966 (citing Chovan, 735 F.3d at 1140). The government does not face an "unnecessarily rigid burden of proof . . . so long as whatever evidence [it] relies upon is reasonably believed to be relevant to the problem that [it] addresses." Id. at 965 (quoting City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 50-52, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986)) (first alteration in Jackson).

      Courts afford "substantial deference to the predictive judgments" of the legislature. Turner Broad. Sys., Inc. v. FCC,

512 U.S. 622, 665, 114 S. Ct. 2445, 129 L. Ed. 2d 497 (1994).

As the Second Circuit—relying on Supreme Court First Amendment principles—has cautioned, courts must be mindful that "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." Kachalsky v. Cty. of Westchester, 701 F.3d 81, 97 (2d Cir. 2012) (quoting Turner Broad. Sys., Inc., 512 U.S. at 665, 114 S. Ct. 2445).  The Court is sensitive to these same principles in the broader Second Amendment context.  See id at 100 ("State regulation under the Second Amendment has always been more robust than of other enumerated rights.").

Here, data and logic establish a reasonable fit between HRS § 134-53(a) and the State's interests in public safety and reducing gang-related crime.  An independent examination of the record shows reliable evidence that butterfly knives are closely associated with crime and popular with minors and gang members.  See generally Ex. E to State's Mot. (legislative history of HRS § 134-53); see also Legis. Comm. Report No. 1389 (finding that certain types of knives, including butterfly knives, "are associated with gang activity"); Letters from Dep't of the Prosecuting Attorney (supporting the ban based on evidence of increased access to butterfly knives by minors).

- 38 -

Particularly compelling is testimony from the Honolulu Police Department indicating a noticeable uptick in the use of butterfly knives by minors and gang members.  See HPD Letter (noting that butterfly knives are "preferred" by minors and gang members).  The legislators also gathered evidence showing that butterfly knives were increasingly associated with criminal activities, particularly by minors and young gang members.  See generally Ex. E to State's Mot.

The record also shows that the State tailored the legislation to specifically address butterfly knives.  After the Hawai`i Supreme Court in In re Doe held that Hawai`i's ban on switchblades was more limited than the legislature had intended, the legislature convened to address butterfly knives.  See Legis. Comm. Report No. 1389.  The legislative history plainly reflects the State's concern that easy access to butterfly knives posed a public safety risk.  Id. ("Your Committee finds that certain types of knives, particularly switchblades and butterfly knives, are associated with gang activity.").  Accordingly, it sought to minimize those risks, and it chose to effectuate that objective by stopping access altogether.  Legis. Comm. Report No. 731 & Conf. Comm. Report No. 88 ("Your Committee finds that particular attention needs to be given to butterfly knives by setting them apart from other deadly or dangerous weapons.").  Still, in doing so it was careful to ban

only a narrow category of weapons.  See Murillo, 347 P.3d at 289 (upholding switchblade ban under intermediate scrutiny because "[p]rohibiting the possession of this weapon is, of course, substantially related to this narrow, but important, purpose" of protecting the public from surprise violent attacks); Lacy v. State, 903 N.E.2d 486, 492 (Ind. Ct. App. 2009) (upholding switchblade ban under state constitution because the regulation only banned a narrowly defined type of knife).  Ultimately, the record here supports the State's position that HRS § 134-53(a) promotes important government interests that "would be achieved less effectively absent the regulation."  Fyock, 779 F.3d at 1000 (quoting Colacurcio v. City of Kent, 163 F.3d 545, 553 (9th Cir. 1998)).

Plaintiffs have not otherwise provided evidence sufficient to overcome the deference this Court affords to the legislature.  It is, after all, up to the legislature and not this Court to "weigh conflicting evidence and make policy judgments."  N.Y.S.R.P.A., 804 F.3d at 263 (quoting Kachalsky, 701 F.3d at 99).  The Court is also not persuaded by Plaintiffs' argument that the categorical ban automatically fails intermediate scrutiny.  See Pls.' Mot. 20-22.  The Court already addressed the problems with that argument above, and will

refrain from echoing them here.[9/]  It is enough to say that the State has provided sufficient evidence that its important interests—promoting public safety and reducing access to butterfly knives by minors and gang members—are effectively furthered by the ban.  All the State must show is a "reasonable fit" between its interests and the regulation.  It has met that burden here.

        For these reasons, the Court holds that HRS § 134-53(a)'s ban on butterfly knives survives intermediate scrutiny.

### CONCLUSION

        For the foregoing reasons, the Court holds that HRS § 134-53(a) is not an unconstitutional restriction on the right to bear arms under the Second Amendment.  To summarize the Court's ruling: (1) butterfly knives are bearable arms that trigger Second Amendment protections; (2) the Court assumes without deciding that butterfly knives are commonly used by law-abiding citizens for lawful purposes and therefore fall within the historical scope of the Second Amendment; (3) the ban on butterfly knives is not per se unconstitutional under Heller; (4) because the ban implicates the core right under the Second

---

        [9/]  As stated, judges have had differing views of the scope of Heller within the context of bans on knives.  Compare Hermann, 873 N.W.2d at 321-22 (holding that a total ban on switchblades fails under Heller), with Murillo, 347 P.3d at 288-90 (upholding a total ban on switchblades).  On the facts here, the Court is persuaded by the rationale in Murillo and respectfully disagrees with the rationale in Hermann.

Amendment but does not severely burden that right, intermediate scrutiny applies; and (5) the statute survives intermediate scrutiny because it furthers the State's important interest to promote public safety by reducing access to butterfly knives, which leads to gang-related crime.

While recognizing that Heller does not cleanly resolve all the constitutional questions at play here, this analysis is faithful to Heller.  The Court hereby DENIES Plaintiffs' Motion for Summary Judgment and GRANTS the State's Motion for Summary Judgment.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai`i, May 13, 2020.



_____
Alan C. Kay
Sr. United States District Judge

Teter v. Connors, Civ. No. 19-00183 ACK-WRP, Order Denying Plaintiffs' Motion for Summary Judgment and Granting the State's Motion for Summary Judgment