1                    IN THE UNITED STATES DISTRICT COURT

2                         FOR THE DISTRICT OF HAWAII

3

4    ANDREW TETER and JAMES GRELL,   )  CIVIL NO. 19-00183 ACK-WRP
                                      )
5                   Plaintiffs,       )  Honolulu, Hawaii
                                      )
6         vs.                         )  April 28, 2020
                                      )
7    CLARE E. CONNORS, in her         )  TELEPHONIC HEARING RE:
     Official Capacity as the         )  PLAINTIFFS' MOTION FOR
8    Attorney General of the State    )  SUMMARY JUDGMENT [33] AND
     of Hawaii, and AL CUMMINGS, in   )  DEFENDANTS' MOTION FOR
9    his Official Capacity as the     )  SUMMARY JUDGMENT [36]
     State Sheriff Division           )
10   Administrator,                   )
                                      )
11                  Defendants.       )
     _____)

12

13                   TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE ALAN C. KAY
14          SENIOR UNITED STATES DISTRICT COURT JUDGE

15   APPEARANCES:

16   For the Plaintiffs:       ALAN ALEXANDER BECK, ESQ.
                               Law Office of Alan Beck
17                             2692 Harcourt Drive
                               San Diego, California 92123
18
                               STEPHEN D. STAMBOULIEH, ESQ.
19                             Stamboulieh Law, PLLC
                               P.O. Box 4008
20                             Madison, Missouri 39130

21   For the Defendants:       RYAN M. AKAMINE, ESQ.
                               Department of the Attorney
22                             General, State of Hawaii
                               425 Queen Street
23                             Honolulu, Hawaii 96813

24

25   (Continued)

```
 1   APPEARANCES (Continued):

 2   For the Amicus Curiae      KEVIN G. O'GRADY, ESQ.
     Hawaii Firearms            The Law Office of Kevin O'Grady, LLC
 3   Coalition:                 1136 Union Mall, Suite 808
                                Honolulu, Hawaii 96813
 4
     For the Amicus Curiae      WENDY F. HANAKAHI, ESQ.
 5   Everytown for Gun          DENTONS US LLP
     Safety Support Fund:       1001 Bishop Street, 18th Floor
 6                              Honolulu, Hawaii 96813

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22   Official Court            ANN B. MATSUMOTO, RPR
     Reporter:                 United States District Court
23                             300 Ala Moana Boulevard, C-338
                               Honolulu, Hawaii 96850
24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

```
 1   TUESDAY, APRIL 28, 2020                    11:19 O'CLOCK A.M.

 2            COURTROOM MANAGER:  This is Civil Case No.

 3   19-CV-00183 ACK-WRP, Teter, et al. versus Connors, et al.

 4            This case is called for a motion hearing regarding

 5   plaintiffs' motion for summary judgment and defendants' motion

 6   for summary judgment.

 7            Counsel, please state your names for the record.

 8   Thank you.

 9            MR. BECK:  Alan Beck on behalf of the plaintiffs.

10            MR. AKAMINE:  Good morning, Your Honor.  Ryan Akamine

11   on behalf of defendants.

12            MR. STAMBOULIEH:  And Stephen Stamboulieh on behalf

13   of the plaintiffs, Your Honor.  Good morning.

14            THE COURT:  Good morning.

15            I thought Ms. Hanakahi was present also.

16            MS. HANAKAHI:  Yes.  Wendy Hanakahi on behalf of

17   Everytown for Gun Safety.

18            THE COURT:  Okay.  And I understand that Mr. O'Grady

19   of the Firearms Coalition was called, but we haven't been able

20   to reach him.  We left a message for him and he has not

21   responded, so we'll go ahead and proceed at this point.

22            And since plaintiffs filed their summary judgment

23   motion first, we'll proceed with the plaintiffs' case.  And

24   please give me your name before you start so I know exactly who

25   is speaking.
```

1            MR. BECK:  My name is Alan Beck, on behalf of the

2   plaintiffs, Your Honor.  The matter before this Court today is

3   the constitutionality of Hawaii's ban on butterfly knives.

4   Both the plaintiffs in this matter challenge Hawaii's ban on

5   Second Amendment grounds.  As an initial matter, butterfly

6   knives are protected by the Second Amendment.

7            We know this because in Heller, Heller stated that --

8   Heller -- the Second Amendment applies prima facie to all

9   bearable arms.  This creates a rebuttal -- rebuttable

10  presumption of constitutionality to all arms that are bearable

11  on the person.

12           And in the case of knives, there are -- they're

13  explicitly noted, as an example in Heller, as a type of knife.

14  I --

15           THE COURT:  Mr. Beck, I need to interrupt you for a

16  minute.  I do want to say that I have a lot of road

17  construction going on right outside my house.  So you'll all

18  have to bear with the difficulty in hearing on that.

19           But I want to ask you several questions first.  And

20  my first question to you, Mr. Beck, is:  If you would clarify

21  your Second Amendment challenge, whether it's limited to

22  subsection (a) of HRS 134-53; in other words, is it limited

23  just as a blanket ban and not clause (b), which prohibits the

24  use of butterfly knives in the commission of a crime?

25           MR. BECK:  Yes, Your Honor.  This is Alan Beck

1    speaking again.

2            We are solely challenging section (a), which

3    challenges -- our clients want to be able to own butterfly

4    knives for a variety of lawful purposes, both in the home and

5    outside the home.  And we disavow any challenge to the section

6    that deals with challenging to having butterfly knives for use

7    in a crime, Your Honor.

8            THE COURT:  Okay.  So you're not challenging

9    subsection (b)?

10            MR. BECK:  That is correct, Your Honor.

11            THE COURT:  Okay.  Thank you.

12            My next question is:  You stated in your complaint

13    and your reply brief that your clients are bringing both an

14    as-applied and a facial challenge to the law.  And most of your

15    argument hinges on the law being categorically or per se

16    unconstitutional.  So that being the case, it would seem that

17    your challenge would have to be construed as a facial

18    challenge.

19            MR. BECK:  I -- I don't see the practical difference

20    between our -- my plaintiffs' facial and my plaintiffs'

21    as-applied challenge.

22            However, based upon the -- I believe it's just the no

23    set of circumstances -- oh, we -- our clients are trying to

24    make clear that they both want the law struck as to everyone,

25    if possible, all other law-abiding citizens, if possible.  But

1    in the event that this Court would find otherwise, they

2    additionally want the law as applied to them specifically as

3    law-abiding persons that have -- that don't have any history of

4    mental illness, etc.

5              (The court reporter requested clarification and the

6    record was read.)

7              THE COURT:  Yes, we're getting an echo.

8              MR. BECK:  My apologies, Your Honor.  Let me start

9    over on that section.

10             The thrust of my plaintiffs' complaint is to strike

11   the law as to all other -- as for them and other similarly

12   situated law-abiding persons.  But if this Court finds that

13   relief -- is unwilling to grant that relief, the as-applied

14   challenge is there so the law will be struck at the very least

15   as applied to the individual client -- plaintiffs.

16             THE COURT:  Well, what's the standing as far as an

17   as-applied challenge?  There have been no charges against your

18   clients.

19             MR. BECK:  That is correct, Your Honor.  Our -- my

20   plaintiffs' claim to standing is solely because they would like

21   to purchase butterfly knives for use in -- for a variety of

22   lawful purposes, and but for the law, they are -- they are

23   unable to do so.  And so -- and to the extent that the

24   complaint should be construed as an as-applied challenge, it

25   was done so in order to -- to ensure that -- that this Court

1    understands that was -- that the relief we're seeking is to

2    simply persons such as my plaintiffs, law-abiding individuals

3    without a history of mental illness, etc., Your Honor.

4                THE COURT:  Well, aren't you simply making a facial

5    challenge then?

6                MR. BECK:  That's -- that's -- well, that's correct,

7    Your Honor.  I --

8                THE COURT:  Well, then, so I understand you're saying

9    you're only making a facial challenge and not an as-applied

10   challenge?

11               MR. BECK:  What -- yes, Your Honor.  However, I do

12   stress that we are not attempting to strike the law as applied

13   to people with a history of mental illness or felonies or

14   anything along that lines.

15               Our intent by stating that we were making an

16   as-applied challenge is to demonstrate that we wish Hawaii's

17   ban on butterfly knives to be struck as to persons such -- to

18   my plaintiffs and individuals are similarly situated to -- my

19   plaintiffs are law-abiding.

20               And so I'm just -- I'm very hesitant to completely

21   disavow the statement that we're making as -- that challenge,

22   as-applied challenge, because I don't want the Court to believe

23   that we're challenging the law on behalf of individuals that

24   might be otherwise prohibited due to a history of crime or

25   mental illness, Your Honor.

1          THE COURT:  So what's the answer to my question?

2          MR. BECK:  We are making a facial challenge, Your

3    Honor.

4          THE COURT:  Pardon me?

5          MR. BECK:  We are making a -- plaintiffs are

6    making -- my plaintiffs are making a facial challenge, Your

7    Honor.

8          THE COURT:  Okay.  Only a facial challenge and not an

9    as-applied challenge; is that right?

10         MR. BECK:  Yes, Your Honor.

11         THE COURT:  Thank you.

12         Now, another question.  You argue that a categorical

13   ban of butterfly knives should be analyzed in the same way as

14   Heller's complete ban on handguns.

15         Now, why would that approach essentially eliminate

16   Heller's focus on handguns as a quintessential self-defense

17   weapon of choice?

18         MR. BECK:  I -- Your Honor, I believe that Heller

19   should be properly construed to find that -- that it found

20   that -- that handguns, because handguns are quintessential

21   self-defense arms, they receive a -- a great deal of cause to

22   protection.

23         Heller wasn't -- I don't believe Heller was ruling

24   that it was finding that that -- it was somehow placing

25   handguns in that role.  It was the fact that -- it just simply

1    is a matter of fact that handguns are quintessential

2    self-defense arms in the United States.  And because of that

3    preexisting fact, the Court was going to grant -- give it a --

4    the largest amount of constitutional scrutiny possible.

5            So similarly, knives are quintessential self-defense

6    arms.  They are the most commonly owned arm in the United

7    States.  Every home owns at least one arm -- one knife.  So

8    because they're so commonly possessed for lawful purposes and

9    in the same manner as a handgun, if not more so, Heller's same

10   reasoning should be applied to knives, Your Honor.

11           THE COURT:  Yeah, well, we're not talking about any

12   knives.  We're talking about a specific knife.

13           MR. BECK:  Well, yes, Your Honor, I understand that.

14   But in Heller, the matter before the Court -- the litigants,

15   the -- the firearm that was possessed, the handgun that was

16   possessed by Dick Heller was an eight-round revolver, a

17   .22-caliber buttland (phonetic) -- Highland.  That was in our

18   briefing.  And yet the Court did not rule on whether that

19   particular model of handgun was typically possessed.  It just

20   simply found that as a class handguns are protected and did not

21   analyze whether -- what had to occur for a particular type of

22   handgun be protected.

23           So we know from Heller it's a more generalized

24   analysis as to a particular class of arms.  Similarly,

25   butterfly knives are a type of knife.  And it's not that knives

 1   as a class are typically used for lawful purposes as the record

 2   indicates, Your Honor.

 3          THE COURT:  Well, you know, one of the state's

 4   strongest cases is State versus Murillo.  That's M-U-R-I-L-L-O.

 5   And your briefing just barely addressed that case.  In fact,

 6   all you say about it is that you don't concede its reasoning.

 7   That's all you say about Murillo.

 8          MR. BECK:  I -- yes, Your Honor.  State v. Murillo

 9   is -- is the case out of New Mexico.  And we discuss it in

10   our -- our response as part of our discussion of the Wisconsin

11   case.  And the Wisconsin case was able to both distinguish and

12   demonstrate that Murillo's reasoning is faulty.

13          The -- the court in Murillo, as a preliminary matter,

14   it is on the behalf of a criminal defendant and -- who was

15   found in a fight at a Walmart, outside his home.  And so just

16   simply the fact that he was making a challenge outside of

17   the -- outside of the home impacts allegation of criminal

18   misconduct.

19          Secondly -- and this is on page 13 to 14 is where

20   we -- they -- as we just discussed, the -- Murillo finds that

21   knives are -- are peripheral arms to the Second Amendment.  And

22   as I just discussed, that is just simply not the case.  Knives

23   are commonly owned in most homes for a variety of lawful

24   purposes.

25          And as the Wisconsin court stated, the defendant

1   Murillo did not raise the Second Amendment challenge of the

2   trial court, therefore it deprived the state of opportunity to

3   make an evidentiary showing that the challenged statute

4   withheld -- withstood intermediate scrutiny.

5          In Murillo, the litigant raised his challenge up on

6   appeal, and there was no fact-based -- there was no opportunity

7   for discovery.  The -- or any of the other things the trial

8   courts afforded.

9          Furthermore, Murillo deals with switchblades.  The

10  matter before this Court is a butterfly knife.  And to the

11  extent much of what Murillo -- Murillo found that that

12  particular knife, the switchblade, is typically used by

13  individuals for unlawful purposes.  And additionally, there's a

14  rationale to -- there's a public safety issue, because these

15  knives can open quicker.

16         Even if we take Murillo at face value, which we

17  should not, the butterfly knife is highly distinguishable from

18  switchblades.  First off, our expert has demonstrated that

19  butterfly knives are -- open slower than standard pocket

20  knives.  And --

21             THE COURT:  Yeah, maybe -- maybe by a second or two.

22             MR. BECK:  Yes, Your Honor.  I -- I mean, with --

23  within the confines of the -- of the argument, though, I mean

24  they're significantly -- switchblades, at least the Murillo

25  court found, we all concede that the Murillo court found that

1    switchblades are faster than standard knives.  And we've been

2    able to demonstrate that, you know, even if it's by a second or

3    two butterfly knives are not.  So there's any -- yeah, that

4    rationale is out -- out with now.

5         And secondly, Your Honor, both our evidence and

6    frankly much of the state's have demonstrated that unlike the

7    switchblade in Murillo, the -- butterfly knives are not weapons

8    used by criminals, typically.  They are weapons that are

9    typically used for lawful purposes, for martial arts training,

10   for -- for self-defense, for just all sorts of stuff.  I -- in

11   fact, you know, just as a generalized utility knife.  In fact,

12   you know -- go ahead, Your Honor.

13        THE COURT:  In Murillo, the court found that the

14   statute could be considered as banning an entire class of arms,

15   which were switchblades, as you mentioned.  But that then it

16   said it could also be considered as a ban on a mere subset of a

17   type of arms, namely knives, that is itself a mere peripheral

18   self-defense security.

19        And then the court went on and said the real issue

20   is, number one, the degree of burden placed on a right to keep

21   and bear arms, which it found the switchblade was an

22   unsubstantial burden; and number two, the distance from the

23   core of the right, which the court there found was remote.

24        MR. BECK:  Yes.

25        THE COURT:  How do you -- you know, you say the

1    Wisconsin court disagrees.  But doesn't Murillo make a pretty

2    sound argument?

3          MR. BECK:  Well, we as a -- just a preliminary

4    matter, the -- the part where the Murillo court finds that

5    knives are a peripheral arm is just simply untrue.  Relying

6    both upon our arguments and the arguments of the Hawaii Defense

7    Foundation's amicus brief, knives are a standard portion of --

8    a standard self-defense tool.  And they are -- you know, it's

9    just a --

10         THE COURT:  Yeah, but I think -- I think there

11   they're talking about knives in general.  They're not talking

12   about butterfly knives.

13         MR. BECK:  Well, I -- I would rely back on my prior

14   argument that we know from Heller that the -- that knives, that

15   the analysis in Heller did not rely upon what type of handgun

16   that the -- that Dick Heller wished to register.

17         In fact, the handgun he wanted to register is a very

18   unusual one, an eight-round .22-caliber revolver.  Yet that

19   was -- there was no mention of that in the Heller opinion.  Not

20   once in Heller does it refer to making analysis towards the

21   type of handgun and whether or not that particular type of

22   handgun is a -- is in common use or is typically used for

23   lawful self-defense.

24         So to the extent that Murillo relied upon that

25   proposition, then it just could be it contradicted Heller,

1   which, of course, this Court needs to abide by, Your Honor.

2              THE COURT:  Well, you know, actually, in Heller as

3   well as the Ninth Circuit in Jackson ruled that regulations

4   which leave open alternative channels for self-defense are less

5   likely to place the severe burden on the Second Amendment right

6   than those that do not.

7              MR. BECK:  Yes, Your Honor.  Let me address Jackson.

8   In Jackson, the court in Jackson, the Ninth Circuit in Jackson

9   was dealing with a ban on the sale of hollow-point ammunition,

10  and it expressly states in -- that it was applying intermediate

11  scrutiny to that ban because -- for two reasons, Your Honor.

12             First, a person living in San Francisco that wished

13  to own hollow-point ammunition could simply go to -- right

14  across the county line, and, you know, San Francisco County is

15  not a big place to begin with, and head over to -- and buy

16  hollow-point ammunition at any of the gun stores in the

17  neighboring counties, such as Alameda.

18             And secondly, in Jackson, the Ninth Circuit found

19  that -- was dealing with a ban on a sale that expressly

20  disavowed dealing with -- you know, they strongly implied that

21  if it was dealing with a ban of possession that a high-level

22  scrutiny would apply in this matter.

23             Here, Mr. -- or my plaintiffs, the plaintiffs'

24  challenge is distinguishable from Jackson for a number of

25  reasons.  It -- you know, it's just simply a complete ban on

1    possession.  So there's no avenue for the -- for the plaintiffs

2    to own a butterfly knife in any shape, way, or form.

3            So Jackson in fact supports the application of a

4    higher level of scrutiny than the one that was -- than the

5    intermediate scrutiny that it applied in dealing with that ban

6    on mere sales.

7            THE COURT:  Of course, Jackson was taking that

8    statement from Heller.

9            Another question I have is:  Are you challenging HRS

10   134-53 just as to a ban on possessing a butterfly knife in your

11   home, or are you challenging the entire statute?

12           MR. BECK:  We are -- we are challenging it in the

13   home, Your Honor.  If -- and separately -- well, we are -- we

14   would like to carry it, but we are -- we're making two separate

15   challenges, both -- both in the home and the carrying, Your

16   Honor.  But our position is if -- a complete ban outside the

17   home is unconstitutional, as well as the ban inside the home.

18   And there might be reasonable time, place, and manner

19   restrictions that --

20           THE COURT:  Well, didn't the Ninth Circuit rule

21   against you in Peruta on that?  En banc?

22           MR. BECK:  No, Your Honor.  In Peruta, the Ninth

23   Circuit ruled in -- that there's no free-standing right to

24   concealed carry.  Thus --

25           THE COURT:  Right.

1              MR. BECK:  -- the -- I (indiscernible) --

2              THE COURT:  But there's been no ruling, has there, as

3    far as the right to carry openly, correct?

4              MR. BECK:  I -- well, there was a ruling in Young v.

5    State of Hawaii.  And that -- that -- the Ninth Circuit found

6    from a three-judge panel that you have a constitutional right

7    to openly carry outside the home.  However, that opinion was --

8    was taken en banc, and Yagger's (phonetic) -- currently --

9    we're waiting for oral arguments at the en banc court, Your

10   Honor.

11             THE COURT:  I see.  Okay.

12             So your position then, I take it, is you're

13   challenging both the right to possess a butterfly knife in your

14   home, as well as the right to carry it openly in public?

15             MR. BECK:  Yes, Your Honor.

16             THE COURT:  Hello?

17             MR. BECK:  I am here, Your Honor.

18             THE COURT:  Okay.  I thought maybe I had been cut

19   off.

20             COURTROOM MANAGER:  Judge?

21             THE COURT:  Pardon me?

22             COURTROOM MANAGER:  Hi, Judge, it looks like

23   Mr. O'Grady dialed in.

24             Is that you, Mr. O'Grady?

25             MR. O'GRADY:  Yes, ma'am.

1    COURTROOM MANAGER:  Okay, thank you very much, sir.

2    THE COURT:  Another question for you, Mr. Beck.

3   Heller limits the Second Amendment right to apply to weapons in

4   common use for lawful purposes.  So what's your understanding

5   of the scope of their test, and what is your best evidence that

6   butterfly knives are the type of arms that were in common use?

7    MR. BECK:  I believe that this -- that the best

8   understanding of that test is -- and this is based to a large

9   degree on circuit precedent that is -- that there -- initial

10  matter, there is a rebuttable presumption of -- that all

11  bearable arms are protected by the Second Amendment.

12   And the burden -- this portion is made by Heller.

13  And this is the precedent of the Second Circuit as well, that's

14  adopted, I believe Heller's position to be, where there's a

15  rebuttable presumption that a bearable arm is protected.

16   So once you establish --

17    THE COURT:  I'm sorry.  I wasn't able to understand

18  the last couple of words.

19    MR. BECK:  My apologies, Your Honor.

20   The Heller and -- based upon Heller, the Second

21  Circuit has found that there's a rebuttable presumption that

22  all bearable arms are protected by the Second Amendment.  Thus,

23  once you establish that something is an arm, the burden shifts

24  to the government to demonstrate that it is not protected.  And

25  this we know -- the following we know, from circuit precedent,

1   is that it -- you simply need to -- that the -- it's not really

2   a numerical analysis per se; it's really a finding that the

3   typical use of a -- of an arm is for lawful purposes.  And

4   that's the best way to interpret the common use language,

5   commonly used for lawful purposes.

6           So rather than a numerical -- some sort of numerical

7   finding as, you know, a million arms of this particular type,

8   we look of the set of arms that are possessed, are these

9   weapons are typically used for -- for -- lawfully, or are these

10  arms like in an unpublished case, the Ninth Circuit discussed

11  regarding explosives, weapons that typically would be used and

12  possessed for unlawful purposes, Your Honor.  And --

13          THE COURT:  What was the name of the Second Circuit

14  case?

15          MR. BECK:  The Second Circuit case?  That's New York

16  Rifle & Pistol.  Let me -- yeah, let me --

17          THE COURT:  The Supreme Court --

18          MR. BECK:  I'm sorry.  New York State --

19          THE COURT:  The Supreme Court just punted on that.

20          MR. BECK:  No, no, no.  I'm sorry, Your Honor.  I --

21  New York State Rifle & Pistol Association v. Cuomo.  New

22  York's -- there's a couple ones with that plaintiff.  And this

23  was New York State Rifle & Pistol Association v. Cuomo, at 804

24  F.3d 24D -- 242, 2-d -- Second Circuit 2015.  And that case is

25  in our briefing, Your Honor.

1           The one that the -- and that dealt with the

2    constitutionality of the New York State's ban on -- on certain

3    types of rifles and high-capacity magazines as -- of course,

4    the one the Supreme Court just punted on was -- dealt with the

5    transport law out of New York City.

6           THE COURT:  All right.  All right.

7           Another question I just wanted to ask you before you

8    proceed with your opening, and that is:  Would invalidating the

9    butterfly knife statute in Hawaii -- what's your position as to

10   a state ban on switchblades, that statute?

11          MR. BECK:  You know, I -- my plaintiffs are trying to

12   get a butterfly knife.  And throughout the course of this, you

13   know, the discovery and all the evidentiary issues that have

14   been dealt with in this case have dealt with the history of the

15   butterfly knife.  And the record hasn't been -- hasn't been

16   produced on switchblades.

17          What I would say is our position is that butterfly

18   knives are, you know, commonly owned for lawful purposes.

19   Assuming without conceding that a switchblade is not owned for

20   lawful purposes, then, of course, a favorable ruling on

21   butterfly knives would not impact the constitutionality of

22   Hawaii's switchblade ban, Your Honor.

23          THE COURT:  Well, okay, thank you.

24          What else would you like to say in presenting your

25   arguments?

```
 1            MR. BECK:  Yes, Your Honor.  Thank you, Your Honor.
 2            The bottom line here is the state has not produced
 3   any evidence that Hawaii's ban on butterfly knives actually
 4   promotes any sort of public safety interest.  And under any
 5   level of scrutiny that this Court would apply, the -- the state
 6   needs to present a -- a strong government interest that's
 7   supported by -- that's supported by actual evidence that -- you
 8   know, that butterfly -- that banning butterfly knives actually
 9   produces the result that they want.  And it's --
10            THE COURT:  Well, you want me to ignore the testimony
11   of the Honolulu police officers?
12            MR. BECK:  Well, the -- the deposition of Officer
13   Nagamine just does not -- they -- he has not -- he didn't
14   demonstrate in any shape, way, or form how butterfly knives --
15   how the ban on butterfly knives actually promotes public
16   safety.  I mean, he conceded that these arms are less deadly
17   than -- than handguns, for example, and he didn't offer any
18   testimony as to --
19            THE COURT:  I don't think -- I don't think anyone
20   disagrees with that.
21            MR. BECK:  Well, yes, Your Honor, but as just simply
22   a matter of law, if a handgun is -- cannot be banned, how can
23   we -- it doesn't seem to make -- there seems not to be a
24   government interest to ban an arm that is less deadly.
25            And the bottom line is --
```

1            THE COURT:  Assuming --

2            MR. BECK:  -- the state does not --

3            THE COURT:  Assuming it's used for a lawful purpose

4    commonly.

5            MR. BECK:  Yes.  It's -- but again, I rely on the

6    Second -- both Heller and the Second Circuit to argue that

7    again the burden was on the state to demonstrate that the

8    typical use of the butterfly knife is unlawful.  There's a --

9    the presumption is an arm is for lawful use, and it would have

10   been -- the onus would have been on the -- on the state to

11   demonstrate that these are typically arms used for something

12   other than lawful purposes.

13            In fact, a lot of the -- the evidence that the state

14   submitted to its -- its moving papers actually supports the

15   proposition that butterfly knives are typically used for -- I'm

16   sorry.  I thought you were about to raise something.

17            But that butterfly knives are typically arms used

18   for -- for martial arts endeavors and self-defense and other

19   lawful purposes.  They have -- the state has failed to present

20   evidence that shows that these arms are -- typical use is for

21   unlawful purposes.  So -- and additionally, both the expert

22   report that was submitted by the -- by us also speaks about

23   the -- about the traditional use of butterfly knives being for

24   lawful purposes, Your Honor.

25            So -- and even using the -- the state's best case as

1  paraphrased, this Court, even that court used intermediate

2  scrutiny.  And as I had previously mentioned, the burden was on

3  the state to both demonstrate that butterfly knives are --

4  typical usage is something other than lawful and that there's

5  actually a government interest here in -- that's supported by

6  evidence and is properly tailored to curbing that interest.

7  And yet the record is devoid of that, Your Honor.

8        In fact, as far as -- the butterfly knives, as far as

9  we can tell, is -- I mean, it's just been banned primarily

10  because it's -- for aesthetics, beyond anything else.

11        So --

12        THE COURT:  Thank you.  Did you have anything else

13  you wanted to say?  It's just that we've been going almost an

14  hour now.

15        MR. BECK:  Yeah, I --

16        THE COURT:  You've taken up most of your time.

17        MR. BECK:  Yes, Your Honor.  I would appreciate a

18  rebuttal to Mr. Akamine's argument.  But I -- I'd like to thank

19  the Court for all its time so far.

20        THE COURT:  Okay.  Thank you.

21        MR. BECK:  Thank you, Judge Kay.

22        THE COURT:  So Mr. Akamine now.

23        MR. AKAMINE:  Yes, Your Honor.  This is Ryan Akamine.

24        We filed a summary judgment motion as well requesting

25  that the Court find the statute constitutional.  We viewed the

1    plaintiffs' claim as a facial challenge and agree with the

2    Court's looking at Murillo as well as looking at the

3    legislative history in this case for testimony establishing the

4    important state interests in banning butterfly knives.

5             THE COURT:  Okay.  I have a couple of questions I

6    want to ask you too.

7             MR. AKAMINE:  Sure.

8             THE COURT:  The first one is:  Do you concede that

9    butterfly knives are bearable arms under the Second Amendment?

10            MR. AKAMINE:  No.  One of our arguments is that it's

11   dangerous and unusual, so I don't think we will concede on --

12   on that, that it's bearable arms.

13            THE COURT:  I'm sorry.  What?  You said something and

14   unusual?  I didn't hear you.

15            MR. AKAMINE:  Yes.  So one of our arguments, our

16   initial argument is that the butterfly knife is a dangerous and

17   unusual weapon.  Therefore, we do not believe it fits within

18   the Second Amendment, you know, protections of bearable arms.

19            THE COURT:  Well, can you identify any post-Heller

20   Second Amendment cases holding that knives are dangerous and

21   unusual weapons for which prohibitions are presumptively lawful

22   under Heller?

23            MR. AKAMINE:  No, I cannot.

24            THE COURT:  Can you identify any post-Heller Ninth

25   Circuit cases upholding the blanket ban on a type of weapon?

1          MR. AKAMINE:  On a type of weapon?

2          THE COURT:  Yes.  Go ahead.

3          MR. AKAMINE:  Not -- if we're looking at knives as a

4    type of weapon, no.  But a ban such as Murillo for switchblades

5    as a subset of a type of weapon -- excuse me, yeah, type -- as

6    a subset of a type of knives.

7          THE COURT:  Yeah, all right.  I concur that Murillo

8    seems to be one of your stronger cases.

9          Now, why is this blanket ban different from the

10   blanket ban in Heller and the most subsequent cases finding

11   that such bans do not pass muster under any level of scrutiny?

12         MR. AKAMINE:  This case involves butterfly knives,

13   Your Honor, for which the Hawaii legislature took in testimony

14   determining whether or not they should or should not have a ban

15   on this subset of knives.  And the legislature found, after

16   hearing testimony both for and against the ban on

17   switchblades -- I mean, excuse me -- on butterfly knives,

18   believed that butterfly knives were typically used by gang

19   members and intimidating.  They were easy to conceal and

20   intimidating when brandished.

21         And so they found that these types of weapons were

22   used by those for offensive criminal purposes and chose to ban

23   them.  This is not unlike something that plaintiffs' expert

24   mentioned, where he said -- he told a story about his -- his

25   sister or someone coming to the rescue of him when he was

1    confronted by some bullies and whipped out that butterfly
2    knife, and the brandishing of the knife itself was enough to
3    scare away the bullies.
4            So these -- that's what -- that's similar to what the
5    legislature found when it took in testimony by HPD.
6            THE COURT:  You know, I have trouble with this
7    argument about a butterfly knife being more concealable than
8    other knives.  Seems to me just about any knife that's -- you
9    know, a pocketknife or of that nature, or switchblade knife,
10   butterfly knife, they're all very concealable, aren't they?
11   Equally concealable?
12           MR. AKAMINE:  I would say if the size of the knife is
13   similar, that is true.  I think the concealable argument was
14   just one part of the argument for the legislature to consider
15   because they considered not only the concealable nature of it,
16   but who was using it and the ease of the use.
17           THE COURT:  What's your evidence that butterfly
18   knives are unusual?
19           MR. AKAMINE:  Well --
20           THE COURT:  In other words, that they're not
21   typically used by law-abiding citizens for lawful purposes.
22           MR. AKAMINE:  Right.  So we've -- just from the
23   testimony that was received, Your Honor, I think that
24   there's -- you know, the legislature took in testimony both for
25   and against, took in testimony by the Pedoy School of Martial

1    Arts, as well as from the prosecutor's office, public

2    defender's office and HPD.  And just from that testimony, that

3    the HPD and prosecutor's office found it being used for the

4    most part by those not law-abiding citizens, that's the

5    testimony that we have.

6            THE COURT:  Now, in your opposition to plaintiffs'

7    motion, you really didn't address whether the law would pass

8    muster under strict scrutiny.  Do you concede that it would

9    not?

10           MR. AKAMINE:  No, I don't think we would concede that

11   at all, Your Honor.  I think that -- that the intermediate

12   scrutiny is the proper constitutional review.  But we also

13   argue that it's dangerous and unusual in that sense as well and

14   isn't a bearable arm.  But in terms of it being subject to

15   strict scrutiny, I don't think any of the courts have utilized

16   that particular review for this type of case.

17           THE COURT:  You know, under Heller, how do you defend

18   a ban on possession in your own home of a butterfly knife which

19   can be used for self-defense?

20           MR. AKAMINE:  Well, I think, first of all, it's -- as

21   I said earlier, one of -- our initial argument is that it's a

22   dangerous and unusual weapon, not typically used by law-abiding

23   citizens, and therefore not subject to Second Amendment

24   protection.  That goes for in the home as well.  And it is a

25   typically -- well, the legislature found that it was being used

1    for offensive purposes as well, and not for defensive purposes.

2            THE COURT:  Okay.  Those were the questions I wanted

3    to ask you initially.  So please proceed with your

4    presentation.

5            MR. AKAMINE:  Your Honor, as I mentioned, our first

6    argument is that butterfly knives are dangerous and unusual and

7    are not subject to the protections of the Second Amendment.

8            Alternatively, other types of weapons have been

9    subjected by courts, including the Ninth Circuit, to

10   constitutional scrutiny under the intermediate scrutiny test.

11   And under that test the law provides and asks similar to what

12   Murillo did in that case, was whether the challenged law

13   burdens conduct protected by the Second Amendment and, if it

14   does, to apply the level of scrutiny.

15           And in this case, applying intermediate scrutiny, we

16   have to look at whether the government's stated objective is

17   significant, substantial, or important, then secondly, whether

18   there's a reasonable fit between the challenged regulation and

19   the asserted objective.

20           Here, Your Honor, the objective of the legislature

21   was the safety of the public after having found or having taken

22   in testimony by those for and against the ban on butterfly

23   knives.

24           And the legislature, the way they looked at it was

25   initially it believed that the butterfly knives fell within the

1    switchblade statute, the same statute mentioned -- Your Honor

2    mentioned earlier.

3           But the In re, in the Interest of Doe case, where the

4    court found that the opening of the butterfly knife wasn't by

5    inertia and gravity and found that that didn't apply.  So the

6    legislature specifically went back and said, okay, so we now

7    understand that the court is interpreting our switchblade

8    statute as not applying to butterfly knives, but we -- we want

9    to look at butterfly knives and -- and fashion a statute that

10   applies to that.

11          So in doing so, they took in testimony.  They found

12   that butterfly knives were being used by those with criminal

13   intent, gangs and other people, and then decided to -- to enact

14   the statute.

15          And that statute was specifically to address the

16   important public interest of safety.  And by banning a specific

17   subset of knives, particularly this butterfly knife, they were

18   able to then say, yes, these butterfly knives are banned in the

19   same way that switchblades are.

20          And I think in light of that reasoning, Your Honor,

21   the legislature met the intermediate scrutiny test and this

22   butterfly knife statute should be upheld as constitutional.

23          I think that the testimony provided at the time,

24   provided to the legislature at the time the statute was enacted

25   is sufficient evidence to show the important government

1    interests and the specific fit of the statute.

2              We believe that the same reasoning stated in Murillo

3    should apply to this case, and the statute should be found

4    constitutional.  That's all I have, Your Honor.

5              THE COURT:  Okay.  Thank you very much.

6              And then before we go back to Mr. Beck, I want to ask

7    either of the -- well, first off, I'll ask Ms. Hanakahi if you

8    have anything you want to say.

9              MS. HANAKAHI:  This is Wendy Hanakahi.  No, Your

10   Honor, I don't have any -- any argument or comments.

11             THE COURT:  Okay.  Thank you.

12             And Mr. O'Grady, did you have anything you wanted to

13   say?

14             MR. O'GRADY:  No, Your Honor.  Thank you.

15             THE COURT:  Thank you.

16             And back to you, Mr. Beck, do you want to say

17   something more?

18             MR. BECK:  Yes, Your Honor.  Sorry, I was -- had my

19   phone on mute.

20             Just the --

21             THE COURT:  I'm getting a real echo from you now.

22             MR. BECK:  My apologies, Your Honor.  Can you hear me

23   better now, Your Honor?

24             THE COURT:  Yes.  Thank you.

25             MR. BECK:  As a preliminary matter, the state's

1   position that butterfly knives are dangerous and unusual is

2   foreclosed by Ninth Circuit precedent in United States v.

3   Henry.

4          In Henry --

5          THE COURT:  Sorry -- I'm sorry.  Ninth Circuit case

6   in -- what's the name of the case?

7          MR. BECK:  United States v. Henry, Your Honor.

8          And that is cited to in our briefs.

9          In Henry, the -- the Ninth Circuit, while ruling on

10  the constitutionality of the federal machine gun ban, found

11  that -- that -- that machine guns are particularly dangerous,

12  and they looked at whether -- at the fact that machine guns are

13  much, much more dangerous than typical arms, and found that the

14  dangerous prong was fulfilled by that.  And here, the state by

15  its expert has conceded that knives are less dangerous than a

16  handgun.

17         So based upon Ninth Circuit precedent, the argument

18  that knife -- that butterfly knives are dangerous, unusual has

19  been foreclosed by -- by their position that knives are less

20  dangerous than handguns.

21         And the -- so with that, we have to move to the --

22  the constitutional -- under any level of scrutiny, this ban,

23  the state has not demonstrated that there's actually a -- that

24  there's actually any type of public safety benefit to a

25  complete -- to their ban on butterfly knives.

1           And now on simply the typical scrutiny analysis being

2    enough to demonstrate that, there also is a --

3    under-inclusivity argument, which also supports this position.

4    And here under-inclusivity applies because, as state's counsel

5    has just conceded, there -- other knives are just as

6    concealable.  And as are -- as some of the studies we cite to,

7    there are many types of knives that are much more dangerous

8    than a -- than a butterfly knife.

9           For example, we cite to a study that shows that a --

10   that a butcher knife is -- is roughly twice as likely to be --

11   to result in death.  Injury from a butcher knife is about -- is

12   twice likely to end in death as a switchblade, which the state

13   seems to take the position is about as dangerous as a cutting

14   instrument as a butterfly knife.

15          THE COURT:  I'm sorry --

16          MR. BECK:  So the fact that --

17          THE COURT:  If I can interrupt you, you mentioned the

18   butterfly and the switchblade knife.  You were referring to

19   another type of knife, and I didn't hear what you said.

20          MR. BECK:  A butcher knife, Your Honor.

21          THE COURT:  Oh.

22          MR. BECK:  Yeah.  Yes, Your Honor.  One of our

23   studies says --

24          THE COURT:  You're not -- you've got machetes in

25   there too.  They're not quite as feasible, are they?

1          MR. BECK:  I will concede that, Your Honor.  Yeah --

2          THE COURT:  All right.

3          MR. BECK:  Yes, Your Honor.  But --

4          THE COURT:  Getting pretty far afield.

5          MR. BECK:  Yes, I mean, I -- unless this Court -- I

6     think I've laid out my position here, Your Honor.  And so I

7     would be happy to answer any other questions that the Court may

8     have.  However -- and -- but if the Court does not have any

9     other questions, I -- I would like to submit, Your Honor.

10          THE COURT:  Okay.  Thank you.

11          And Mr. Akamine, did you have anything more you

12    wanted to say?

13          MR. AKAMINE:  No, Your Honor, I don't.

14          THE COURT:  Okay.  Well, thank you, all.  I'm going

15    to take this under submission to give it further thought.  And

16    I will issue a written decision.  So thank you, and have a good

17    day and stay safe.  Good-bye.

18          MR. AKAMINE:  Thank you, Your Honor.

19          MR. BECK:  Thank you, Your Honor.

20          MR. O'GRADY:  Thanks, Your Honor.

21          MS. HANAKAHI:  Thank you, Your Honor.

22          (The proceedings concluded at 12:23 p.m., April 28,

23    2020.)

24

25

1                    COURT REPORTER'S CERTIFICATE

2              I, Ann B. Matsumoto, Official Court Reporter, United

3     States District Court, District of Hawaii, do hereby certify

4     that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

5     complete, true, and correct transcript of the stenographically

6     recorded proceedings held in the above-entitled matter and that

7     the transcript page format is in conformance with the

8     regulations of the Judicial Conference of the United States.

9              DATED at Honolulu, Hawaii, June 2, 2020.

10

11

12

                    */s/ Ann B. Matsumoto*
13                  ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25